IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ROBERT PINTER,

    PLAINTIFF

                          09 Civ 7841 (CM)(THK)
    vs                   PLAINTIFF'S FIRST
                          AMENDED COMPLAINT
THE CITY OF NEW YORK, a municipal  [JURY TRIAL]
entity, NEW YORK  CITY UNDERCOVER
POLICE OFFICER # 31107, NEW YORK CITY
POLICE OFFICERS "JOHN DOES", individually
and in their official capacities, NEW
YORK CITY POLICE COMMISSIONER RAYMOND
KELLY, individually and in his official
capacity, NEW YORK CITY MAYOR MICHAEL
BLOOMBERG, individually and in his official
capacity, ASSISTANT CHIEF RAYMOND DIAZ
OR "JOHN SMITH", the then Commanding
Officer of Patrol Borough Manhattan South
on October 10, 2008, individually and in his
official capacity, CAPTAIN "JOE" BRAILLE,
Commander of the Vice Squad of Patrol Borough
Manhattan South, individually and in his
official capacity, CHIEF ANTHONY IZZO,
Commander of the Organized Crime Bureau of the
New York City Police Department, individually
and in his official capacity, CHIEF JOSEPH
ESPOSITO, individually and in his official
capacity, BRIAN CONROY, individually and in
his official capacity as Deputy Chief of
the New York City Police Department's Vice
Enforcement Division, and SHARI C. HYMAN,
individually and in her official capacity
as Director of the New York City Mayor's
Office of Special Enforcement, DETECTIVE
JESSICA STERLING, Shield # 6132, individually
and in her official capacity, SERGEANT
MICHAEL MADISON, Shield # 4321, individually
and in his official capacity, DETECTIVE MICHAEL
MICHILENA, Shield # 1409, individually
and in his official capacity, DETECTIVE SANDRA
DAILEY, Shield # 1069, individually and in
her official capacity,

    DEFENDANTS
_____

## I.  INTRODUCTION

1.  The event which gives rise to this litigation occurred on October 10, 2008 and concluded on June 22, 2009.

2.  On October 10, 2008 the Plaintiff was unjustly and falsely arrested and maliciously and falsely charged and prosecuted with a criminal offense and otherwise subjected to an extended and unjustified custodial detention and all association therewith including being subjected to malicious abuse of criminal process, discrimination and harassment based on the Plaintiff's sexual orientation or perceived sexual orientation, excessive and unreasonable and unnecessary imprisonment, and excessive and unnecessary and unreasonable terms and conditions of his custodial detention including excessive and unreasonable and unnecessary handcuffing. The charge, which was preferred against the Plaintiff, was dismissed on June 22, 2009 and the Criminal Court proceedings concluded and sealed.

3.  This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and, as well, under the laws and Constitution of the State of New York.

4.  The Plaintiff seeks monetary damages and such other relief, including injunctive relief and declaratory relief [if appropriate], as may be in the interest of justice and as may be required to assure that the Plaintiff secures full and complete relief and justice for the violation of his rights.

## II. JURISDICTION

5.  Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331 and 1343 and 1367 in conjunction with the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the First, Fourth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of New York.

6.  The Plaintiff requests that the Court invoke pendent claim and pendent party jurisdiction.  The State law claims derive from the same occurrence and transaction which gives rise to the federal law claims and they have a

common nucleus of operative fact with the federally based claims.

7.    The Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which the Plaintiff seeks, in addition to monetary damages, whatever other relief is needed to provide full and complete justice including, if appropriate, declaratory and injunctive relief.

8.    This is an action in which the Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and, as well, as guaranteed under the laws and Constitution of the State of New York.

9.    Venue is properly within this Court as the actions and conduct, about which the Plaintiff complains, took place within the geographic boundaries of this Court's jurisdiction; the parties do business and/or reside and/or have offices for doing business within the geographic boundaries of this Court's jurisdiction; and the Plaintiff resides within the geographic boundaries of this Court's jurisdiction.

10.    The Plaintiff has filed a timely Notice of Claim within ninety days of the dismissal of the charge, the concluding aspect of the transaction out of which the litigation arises.

III. THE PARTIES

11.    The Plaintiff is an American citizen and resident of the City of New York, the County of New York, and the State of New York.

12.    The Defendant City of New York is a municipal entity which was created under the authority of the laws and Constitution of the State of New York and which, under the enabling law of the State of New York, has, among other powers, the power to maintain a police department for the purpose of protecting the welfare of those who reside in the City of New York.

13.    Defendants Undercover # 31107, Jessica Sterling, Michael Madison, Michael Michilena, Sandra Dailey, "John

Does", Raymond Diaz, "John Smith", "Joe" Braille, Anthony
Izzo, and Joseph Esposito, and Brian Conroy were on October
10, 2008 and thereafter New York City Police and uniform
Command Officers and agents and employees of the City of
New York.  Although their actions and conduct herein
described were unlawful and wrongful and otherwise
violative of the Plaintiff's rights as guaranteed under the
laws and Constitution of the United States and as
guaranteed under the laws and Constitution of the State of
New York,  the actions and conduct were taken in and during
the course of their respective duties and functions as  New
York City Police and uniform and/or non uniform Command
Officers and as agents and employees of the City of New
York and incidental to the otherwise lawful performance of
their duties and functions as a New York City Police and
uniform and/or non uniform Command Officers and agents and
employees of the City of New York.

    14.  Defendant Raymond Kelly is the Police Commissioner
of the City of New York. Along with Defendant Michael
Bloomberg, the Mayor of the City of New York, and Defendant
Shari C. Hyman, Director of the New York City Mayor's
Office for Special Enforcement, he was and they were
responsible for the promulgation and implementation of law
enforcement policies and practices and approaches of the
City of New York and executed on behalf of the City of New
York.  In that regard and among other policies and
practices and approaches which they and their subordinates
promulgated and implemented and executed, the latter with
the express or constructive knowledge and consent of the
former, are the policies and practices and approaches which
are described and set forth hereinafter and which propelled
the conduct taken against the Plaintiff about which the
Plaintiff complains.  They are sued in their individual and
official capacities.

IV. ALLEGATIONS

    15.  The Plaintiff is Robert Pinter.

    16.  The Plaintiff resides in the lower eastside of New
York City.  The Plaintiff has resided at his present
residence address for approximately twenty eight [28]
years.

    17.  The Plaintiff resides by himself.

4

18.    The Plaintiff is now fifty four [54] years of age and was, at the commencement of this litigation, fifty three [53] years of age. At the time of the Plaintiff's arrest as hereinafter described, the Plaintiff was fifty two [52] years of age.

19.    The Plaintiff's birth date is November 23, 1955.

20.    The Plaintiff was born and raised in Milwaukee, Wisconsin.

21.    The Plaintiff attended the University of Wisconsin, Milwaukee and Southern Methodist University in Dallas, Texas, the latter from which he graduated in 1980 with a BFA degree.

22.    The Plaintiff, who is gay, grew up in Milwaukee, Wisconsin and graduated from the Thomas More high school in that City in 1973.

23.    Plaintiff is a New York State licensed massage therapist.  He maintains a private practice with his own Fifth Avenue office and he is also employed as a massage therapist for the clients of the non for profit organization known as Housing Works.

24.    He has practiced in his profession as a massage therapist for approximately seventeen [17] years.

25.    Many of the individual to whom the Plaintiff provides his professional services as a duly New York State licensed massage therapist are individuals with HIV/AIDS. The Plaintiff's massage therapy is part of the prescribed regimen of treatment for the HIV/ADIS condition.

26.    The event which gives rise to this litigation occurred on October 10, 2008 and concluded on June 22, 2009.

27.    On October 10, 2008 the Plaintiff was unjustly and falsely arrested and maliciously and falsely charged with a criminal offense and otherwise subjected to an excessive and unreasonable custodial detention and all association therewith.

28.    The charge, which was preferred against the Plaintiff, was dismissed on June 22, 2009.

29.  On October 10, 2008, the Plaintiff was shopping for a DVD inside of the Blue Door Video Store at 87 1st Avenue, New York City, New York.

30.  The Blue Door Video Store is a short distance from the Plaintiff's residence.

31.  While in the Blue Door Video Store the Plaintiff was approached by a young Asian-American male.

32.  The young male approached the Plaintiff in what the Plaintiff would describe as a flirtatious manner and fashion. The young man suggested to the Plaintiff that he was interested in engaging in a consensual sexual activity.

33.  Plaintiff subsequently learned that the individual, who approached him the Blue Door Video store, was an Asian American Undercover New York City Police Officer with the identity number of 31107.

34.  It is believed that Defendant Undercover 31107 was part of a police field operation team composed of him and Defendants Sterling, Madison, Michilena, and Dailey.

35.  It is further believed that the afore described field operation team was operating pursuant to a policy, practice, and approach of the City of New York, through its Police Department, to effectuate a City policy being pursued by the New York City Mayor's Office of Special Enforcement in coordination with the Police Department To close down adult video stores through the institution of nuisance abatement litigations against identified business entities.

36.  No mention of any money whatsoever was made at the time when the Undercover Police Officer suggested that he and the Plaintiff engaged in a consensual sexual activity.

37.  The only suggestion at the time was the suggestion that the Undercover Officer and the Plaintiff engage in a sexual activity.

38.  The Undercover Officer was the initiator of the suggested activity.

39.   As the Plaintiff was leaving the store, the
Undercover Officer began to leave the store, as well, at
which point the Undercover Officer offered to pay the
Plaintiff fifty dollars for the previously mentioned
consensual activity although the Undercover never showed
the Plaintiff any money and the Plaintiff never, ever
consented to receive any money for sexual activities or,
for that matter, never ever consented to even engage in the
sexual activity which the Undercover had previously
suggested.

40.   The Plaintiff, who had no intention whatsoever of
accepting any money whatsoever for any sexual activity or
for paying for any sexual activity or receiving any monies
for sexual activity, never indicated, in words or actions,
that he would accept any money, that he would pay any
money, or, for that matter, that he would engage in the
sexual activity which had been suggested by the Undercover
Officer.

41.   As a matter of fact, when the money matter was
raised by the Undercover Officer, the Plaintiff, who had
never consented to anything as of that point, became very
suspicious.

42.   As the Plaintiff left the Blue Door Video store,
he began walking away from the Video Store with the
intention of going home, alone. As the Plaintiff was
walking away, the Undercover Officer was walking in the
same direction toward 6th Street and 1st Avenue where the
Undercover Officer had previously indicated, while in the
video store, his car was situated.

43.   After crossing 1st Avenue and walking a little
distance down 6th Street toward his residence, the Plaintiff
noticed, out of the corner of his eye, two casually dressed
individuals rush toward him and push him into a fence on 6th
Street between 1st Avenue and Avenue A by as he recalls.

44.   The Plaintiff had walked a distance of perhaps one
hundred and twenty five feet or thereabouts and had walked
that distance at most in one minute if that when he
observed, out of the corner of his eye, the two individuals
rush toward him and propel him into the fence.

45.   The Plaintiff did not then know where the young
male was situated and located.

46.    The first thought that the Plaintiff had was that he was being robbed by a gang and, further, that he had been set up to be robbed by the young man who had approached him in the Blue Door Video store.

47.    To his shock, the Plaintiff then learned that he was being arrested by the individuals who were New York City Police Officers.

48.    He learned of the fact that the individuals who rushed him and pushed Plaintiff face firs into the fence when he turned his head slightly and observed that one of the men had a bade around his neck identifying him as a Police Officer.

49.    Eventually, the Plaintiff learned that the young Asian man, who had previously propositioned the Plaintiff, was then and is an Undercover Police Officer.

50.    The Plaintiff was handcuffed and taken to a New York City Police Department van vehicle and placed into the vehicle.

51.    Rather than being taken to the Precinct for processing, the Plaintiff was compelled, while rear cuffed with a seat belt constraining him in the van vehicle, to drive around with New York City Police Officers for approximately four hours while the Officers engaged in further police arrest activities.

52.    The Plaintiff was in serious pain as a consequence of the handcuffing and seat belt constraints four hour period of driving around.

53.    The handcuffs were tight, initially, and appeared to tighten even further causing the Plaintiff increased pain about which he complained on numerous occasions.

54.    The Plaintiff asked that the handcuffs be loosened.

55.    The Officers refused to loosen or otherwise adjust the handcuffs.

56.    The Officers continued to state that the Plaintiff would be transported to a Precinct "soon".

57.  The "soon" consumed approximately four [4] hours.

58.  The Plaintiff was eventually transported, along with two others who had been arrested during the four hour period, to the 7th Precinct.

59.  At the 7th Precinct, the Plaintiff was fingerprinted and photographed and processed.

60.  The Plaintiff remained at the 7th Precinct for several hours until he was then transported to Manhattan Central Booking.

61.  The Plaintiff remained in Manhattan Central Booking until he was brought to a Courtroom pen prior to the Plaintiff's formal arraignment in Court on October 11, 2008 at or about 6:00 P.M. in AR3A.

62.  It is believed that at that time and location, there were eighty [80] cases scheduled for arraignment, sixty seven [67] of which were misdemeanors and thirteen [13] of which were violations.

63.  At the pen, the Plaintiff met with Eric Williams, Esq., a Legal Aid Society attorney, for a very brief period of time.

64.  It is believed that, along with two other Legal Aid attorneys, Eric Williams represented not only the Plaintiff but many of the other sixty eight individuals who were being formally arraigned at the Court session when and where the Plaintiff was being arraigned and who, like the Plaintiff, did not have private counsel.

65.  The Plaintiff, who suffers from high cholesterol and is prescribed with a daily dosage of 20mg of Lipitor that he takes each morning, had not taken his prescribed dosage of Lipitor since the morning of October 10, 2008.

66.  The Plaintiff, who had not slept in approximately thirty six hours and who did not have a clear understanding whatsoever of what was to transpire and what was happening to him other than he had been charged with a crime that he had not committed, informed his attorney that he was innocent of any wrong doing.

67.    In fact, the Plaintiff was innocent of any wrong doing and no reasonable police officer could, objectively and reasonably, have believed, based on what transpired as set forth above, that the Plaintiff had engaged in any unlawful conduct whatsoever.

68.    The Plaintiff recalls telling his attorney that he was innocent and that he had been "set up".

69.    None of the choices available to the Plaintiff with respect to what would transpire at the arraignment were fully explained to the Plaintiff in a manner and fashion which, under the circumstances, allowed him to make a clear choice, at that time, as to what he should do at the arraignment.

70.    The Plaintiff appeared in Court.

71.    The Plaintiff was intimidated, confused, unable to articulate anything, and was afraid, particularly about losing his New York State issued massage therapist license.

72.    Accordingly, the Plaintiff pled guilty, without adequate representation and adequate legal advice [due to the grossly over-loaded case load with which the Plaintiff's Legal Aid attorney was then confronted], to a violation of disorderly conduct even though he had not engaged in any unlawful activity including disorderly conduct and including prostitution with which he had been charged.

73.    The Plaintiff was directed to appear at a further sentencing proceeding on October 21, 2008 in the Midtown Community Court.

74.    The Plaintiff did appear and was sentenced to a conditional discharge, assessment of costs and a requirement that he attend five counseling sessions.

75.    The Plaintiff had no idea whatsoever that, at the sentencing proceeding, he could do anything whatsoever about the plea to the disorderly conduct charge and believed simply that he was there to receive a sentence.

76.    If the Plaintiff had known otherwise, he would have, then and with a clearer understanding, less

intimidation, and less stress than he possessed at the time of his arraignment, withdrawn the plea.

77.   In fact, the Plaintiff did not even realize that the individual, who had called his name at the time of his appearance for sentencing, was an attorney and the Plaintiff believed her to be a clerk [although the Plaintiff subsequently learned that the individual was an attorney].

78.   The Plaintiff had no substantive discussion whatsoever with the attorney at the sentencing proceeding and was never informed that he could, at that time, withdraw his prior plea [at his arraignment] because of the lack of a full understanding, at the time of his plea, about the options open and the ramifications and consequences of the options, the proceedings then at hand, and any subsequent proceedings.

79.   The Plaintiff paid the Court assessment and attended the five mandated "counseling sessions".

80.   At the counseling sessions and/or subsequent thereto, the Plaintiff met several men who, like himself, were either gay or bi-sexual and who had been, under circumstances remarkably similar to the circumstances associated with the Plaintiff's arrest event, arrested.

81.   The Plaintiff began to collect data and began to educate the gay and lesbian and transgender community about the pattern of arrests comparable to the circumstances of the Plaintiff's arrest.

82.   The Plaintiff came to learn that, over a course of time, Undercover Officer # 31107 and other Undercover New York City Police Officers had made dozens of arrests of older gay men and men who were at locations frequented by gay men.

83.   As a consequence of coalition of individuals, including a number of prominent political figures, came together to address these matters.

84.   It came to light and it is believed that the arrests, which had been made [including the Plaintiff's arrest] were actually designed not to make legitimate, probable cause based arrests but were made for the

collateral purpose of endeavoring to shut down numerous video stores, which were believed to be regularly frequented by individuals whom it is believed were disproportionately members of the gay and lesbian and bi-sexual and transgender communities, for which there had been complaints received by the City of New York to shut down those otherwise legitimate business operations.

85. As a consequence of the complaints, the City of New York undertook to sue the businesses as "nuisances" in order to shut them down.

86. In order to make a case to do so and notwithstanding that it is believed that these businesses did not promote prostitution or otherwise engage in improper and offensive and unlawful enterprises, it is believed that the City of New York, through its Police Department and specifically the Organized Crime Bureau and the Vice Squad Division therein, constructed  a field operation policy and practice and approach which authorized and propelled the kinds of arrests which were made of the Plaintiff and many, many others as a justification for their efforts to put these otherwise legitimate businesses out of business.

87. As a consequence of actions of the afore-described coalition of individuals, it is believed that the Police Commissioner and the Chief of the Department and the Mayor of the City of New York, under whose authority the within challenged policy was promulgated and the afore-described field operations taken, re-visited the policy because of the nature and extent of what is believed to be unlawful arrests of individuals in order to make a case for closing down businesses and not to prosecute the arrested individuals for any conduct which was unlawful although the conduct of the arrestees, as described, was asserted  to be unlawful.

88. In that regard, it is believed that the Plaintiff was among at least thirty men arrested by New York City Vice Squad police officers in six adult video stores during the year 2008 whose arrests, including the Plaintiff's arrest, were cited by the City of New York, in its special enforcement undertaken nuisance abatement court efforts, to close these stores including, among the business, the Blue Door business.

89.   It is believed that the City of New York and the Defendant policy makers came to realize in re-assessing the policy pursuant to which the Plaintiff was arrested, Undercover New York City Police Officers were stretching the facts and were otherwise endeavoring to entrap individuals into engaging in unlawful conduct and to accuse such individuals of doing so even when the individuals never agreed to, or entered into, or committed, any unlawful conduct.

90.   It is believed that, subsequent to the arrest of the Plaintiff and after efforts by the Plaintiff and others came together to address the afore-described policy and practice and approach, Defendant Bloomberg acknowledged that the City of New York would investigate and re-assess the afore-described arrest policy, practice, and approach associated with and linked to the Defendant City's nuisance abatement enforcement efforts undertaken with respect to adult video stores including the Blue Door store where the Plaintiff had been arrested pursuant to and under the policy, practice and approach promulgated and being implemented by the City of New York.

91.   Furthermore, it is believed that at a meeting held at the office of City Council Speaker Christine Quinn on February 11, 2008, at which the Plaintiff was present, Defendant Brian Conroy, then the Deputy Chief of the New York City Police Department's enforcement division, indicated, in substance, that, because of the concerns that had been voiced including the concerns about Plaintiff Pinter's arrest, the City of New York had paused in their nuisance abatement lawsuit arrest efforts without which arrests the nuisance abatement lawsuit efforts would be undermined.

92.   It is believed that Defendant Conroy stated, in substance, at that meeting that the City needed to take a step back from the arrest policy, practice and approach which the City's New York City Police Department—and specifically the Vice Squad thereof, had been pursuing in connection with the City's nuisance abatement lawsuit efforts with respect to otherwise legitimate adult movie stores.

93. It is believed that Defendant Conroy stated, in substance, that the policy, practice and approach related to the arrests associated with the City's nuisance

abatement legal efforts, might not be working and that a
different policy, practice, approach might be necessary.

94.  In attendance at the foregoing February 11, 2009
meeting in the Office of the City Council Speaker,
Christine Quinn, it is believed the Defendant Mayor sent
not only his Director of the Mayor's Office of Special
Enforcement, Defendant Shari Hyman, but, as well, Anthony
C. Crowell, counsel to the Mayor, and William Heinzen, an
assistant corporation counsel of the City of New York.

95.  It is believed that of the several 2008 nuisance
abatement lawsuits instituted by the City of New York
against adult video stores [as described], one of the suits
was instituted by the Mayor's Office of Special
Enforcement.

96.  It is believed that there were three other
nuisance abatement lawsuits instituted by the City of New
York in 2008 against adult video stores through the legal
unit of the New York City Police Department.

97.  It is believed, however, that there was
coordination between the Police Department and the Mayor's
Office of Special Enforcement in the bringing of the
nuisance abatement lawsuits against adult video stores.

98.  it is believed, moreover, that the technique
utilized by New York City undercover officers to generate
arrests in connection with the nuisance abatement
litigations brought by the City of New York, either through
the legal unit of the Police Department or through the
Mayor's Office of Special Enforcement [but always in
coordination one to the other], was comparable to the
technique described by the Plaintiff.

99.  The technique involved the Undercover Officers
approaching an individual in an adult video store, the
Undercover initiating flirtation and initiating
conversation regarding sex, the Undercover suggesting the
individual leave the store to have sex in the Undercover
Officer's car outside of the store, and the Undercover,
then, as the individuals were leaving the store, mentioning
giving money to the individual for the sexual activity.

100.  Once out of the store and after proceeding some
short distance and without the individual ever agreeing to

the sexual activity or to receiving or giving monies as had
been mentioned by the Undercover, the individual is bum
rushed by the "arrest team" and charged with prostitution.

101.  It is believed, too, that the Undercover Officer
asserts in the Criminal Court Complaint that,
notwithstanding that the individual did not consent to
actual engagement in sexual conduct and did not consent to
the receipt of monies or to the payment of monies in
exchange for sexual activity, the individual did consent to
the sexual activity and more importantly consent to
engaging in the sexual activity for the exchange of money.

102.  It is believed that the foregoing technique was
utilized to make several arrests, including the arrest of
the Plaintiff, at the Blue Door Video store in order to
bolster the nuisance abatement lawsuit brought by the City
of New York against the Blue Door Video store.

103.  It is believed, too, that the records in the City
commenced nuisance abatement lawsuit against the Blue Door
Video store was, among the several 2008 nuisance abatement
lawsuits brought by the City against adult video stories,
the most extensive.

104.  It is believed that New York City Police Officers
have arrested fifty two men in eight different Manhattan
adult video stores dating back to 2004 and, citing the
arrests, the City of New York has brought nuisance
abatement lawsuits against seven of the eight businesses,
including the Blue Door Video store, seeking to close those
businesses.

105.  It is believed that eight of the twelve men
arrested during the relevant period of time at the Blue
Door video store, including the Plaintiff, were forty two
years of age or over. Moreover, it is believed that two of
the twelve were from other states—California and Virginia,
and another two, a couple, were from Europe.

106. If the accountings of the Undercover Officer
involved in the arrests were to be credited, one would have
to believe that four of the twelve individuals, who were
arrested at the Blue Door Video store for alleged
prostitution, traveled substantial distances –from
California, Virginia, yes, even Europe, to earn a minimal
sum of money as prostitutes.

107. Eventually and in the context of the efforts of the coalition of individuals, a meeting was held in March, 2009 by individuals in the coalition with, among others, New York County District Attorney Robert Morganthau, himself, and members of his Office at which the District Attorney himself expressed concern about the situation which had been brought to his attention and indicated that his office would look into the matter including the many arrests which had taken place over time in this regard and that he would address the matter in an appropriate manner and fashion once his office undertook its investigation into such.

108. Moreover it is believed in or about March, 2009 and following the meetings in Speaker Quinn's Office and the meeting with Manhattan County District Attorney Morgenthau about the alleged dubious and false arrests of gay men at adult video stores including the arrest of the Plaintiff [among others], it is believed Defendant Commissioner Kelly called and convened a meeting of the heads of the Police Department's Organized Crime Control Bureau, which oversees the Vice Squad, and other command Officers including, it is believed, the Defendant Chief of the Department, the Defendant Commanding Officer of Patrol Borough Manhattan South, and the Defendant head of the Vice Squad of the Patrol Borough Manhattan South, within whose jurisdiction the arrest described herein were made under their auspices and ultimate command responsibility.

109. It is believed that, as a consequence of the meeting and because of the problems and concerns with the policy, practice, and approach of the field operations utilized and executed to implement the nuisance abatement litigation policy and practice associated with the closing of adult video stores, procedures were put into place to address the problems and concerns about the unjustified, probable cause lacking false arrests which were being made because of the City's nuisance abatement litigation policy and practice with respect adult video stores.

110. Subsequent to the meeting with District Attorney Morganthau's, the Plaintiff, having obtained private counsel, moved, on or about April 17, 2009, to vacate his October 11, 2008 disorderly conduct plea [at arraignment], the Plaintiff having already completed the terms and conditions of his sentence attached to his plea including

the payment of the Court imposed assessment and including
his attendance at the five [5] mandated "counseling
sessions".

111.   The New York County District Attorney's Office did
"not oppose" the Plaintiff's Motion to Vacate his
conviction and indicated that, if the Motion was granted,
the District Attorney's Office would move to dismiss the
accusatory instrument against the Plaintiff.

112.   In its papers, the New York County District
Attorney's Office stated, among other things, that "the
People have concluded that it is unlikely that the
defendant went to the location of the occurrence with the
intent to solicit money for sex, as supported by his age
(52 upon arrest), lack of prior record for prostitution
related offenses, and overall law-abiding history".

113.   In fact, the only prior arrest of the Plaintiff
had occurred back in 1981, when the Plaintiff was
approximately twenty five years old. He was, then, arrested
in Milwaukee, Wisconsin and charged with "driving while
impaired".

114.   The Plaintiff has been in alcohol related recovery
for over eighteen years and regularly attends and is an
active member of Alcoholics Anonymous [AA].

115.   In fact, the Plaintiff never solicited sex from
the Undercover Officer and never, ever agreed, in words or
otherwise, to have sex with the Undercover Officer.  In
fact, the Plaintiff never agreed, either verbally or in any
other manner ands fashion, to receive from or pay money to
the Undercover Officer for sex.

116.   In fact, the Plaintiff was in the Blue Door Video
store looking for a DVD.

117.   On June 22, 2009, the Criminal Court of the City
of New York, State of New York, County of New York, granted
the Plaintiff's Motion to vacate the Plaintiff's October
11, 2008 disorderly conduct plea conviction which was
secured under duress and lack of an informed decision and
judgment by the Plaintiff as a consequence of the
circumstances as described herein.

118.  On or about that date and upon the Motion of the
New York County District Attorney's Office to dismiss the
accusatory instrument and the charge encompassed therein,
the Criminal Court dismissed such and the Criminal
proceedings were ended with a merits favorable resolution
of the matter.

119.  In its papers related to the Plaintiff's Motion to
Vacate, the New York County District Attorney's Office
noted that the New York County District Attorney's Office
had recently dismissed three pending cases with
circumstances similar to those of the Plaintiff's arrest
because, as with the Plaintiff's arrest and prosecution,
"it would be difficult to prove the guilt of the defendants
in those cases beyond a reasonable doubt at trial", just as
it would have been to do so with respect to the Plaintiff's
case.

120.  It is believed that the Undercover Officer
involved in the Plaintiff's arrest, along with another
Asian American Undercover Officer who was involved in
similar arrests, were at the time of their activities, part
of the Patrol Borough Manhattan South Vice Crimes
Enforcement Squad as part of and/or related to the overall
New York City Police Department Organized Crime Bureau.

121.  It is believed that during 2008 at least thirty
men, all of whom are believed to be gay, bisexual or
transgender, were arrested, under the circumstances
comparable to those of the Plaintiff's arrest, and charged,
like the Plaintiff, with prostitution, for a collateral non
legitimate arrest justification but rather as a mechanism
to implement a New York City promulgated policy and
practice which targeted adult video stores that were
regularly frequented by members of the gay, lesbian, bi
sexual, transgender communities in order to put those
stores out of business notwithstanding that the stores were
engaged in legitimate businesses which were frequented by
law abiding members of the gay, lesbian, transgender, and
bi-sexual communities.

122.  It is believed that the several adult video stores
were so targeted by the New York City Mayor's Office of
Special Enforcement in conjunction with the New York City
Police Department [under the imprimatur and it is believed
with the actual or constructive knowledge of the Mayor of
the City of New York, the Police Commissioner of the City

of New York, and the Chief of the New York City Police
Department and other high level command officers including
the Command officer of the Organized Crime Bureau, the head
of Patrol Bureau Manhattan Vice Division, and the
Commanding Officer of Patrol Bureau Manhattan South].

123.  It is believed that one of the targeted adult
video stores was the Blue Door Video store.

124.  Many of those individuals, if not all, who were
arrested pled guilty to disorderly conduct if their
respective charges were not dismissed on the Motion of the
New York County District Attorney's Office this
notwithstanding that many if not all of those individuals
were not guilty of disorderly conduct or any crime but were
victims of the arrest collateral purpose of implementing
the New York City policy to put stores, associated with the
arrests of patrons of those stores, out of business
although it is believed that they operated legitimate
business, albeit businesses frequented largely although not
necessarily exclusively by law abiding members of the gay
and lesbian and bi sexual and transgender communities.

125.  It is believed, too, that in one of the
litigations involving the Blue Door Video Store, the
location at which the Plaintiff was arrested, the
Undercover Officers including, it is believed the
Undercover Officer involved in the Plaintiff's arrest,
admitted that the Officers approached the individuals
ultimately arrested, initiated the conversations, suggested
leaving the store with the individuals to have sex in an
apartment or a car outside of the store, and that they, not
the individuals,  mentioned money.

126.  It is believed that on October 10, 2008, the date
of the Plaintiff's arrest as a consequence of the City
policy and practice and approach activities and conduct of
Defendant Undercover Officer 31107, Defendant Undercover
Officer 31107 executed what is known as a "Complaint
follow-up Informational" in which he described the basis on
which he arrested the Plaintiff and caused those, within
his "team" to effectuate the arrest and to have an
individual assigned and designated as the arresting
Officer, to wit: Defendant Detective Jessica Sterling,
based on what Defendant Undercover Officer 31107 stated,
falsely in material respects, occurred to allegedly justify
the Plaintiff's arrest.

127.   The Defendant members of the "arrest team acted in
conjunction and concert with each other to effectuate the
otherwise unlawful policy, practice, and approach which
propelled the Plaintiff's arrest and they otherwise acted
in conjunction and concert with each other to arrest the
Plaintiff.   The Defendant members of the "arrest team knew
or should have known that the Plaintiff's arrest was
unlawful and without any basis.

128.   Defendant Undercover 31107 stated that, having
entered into entered into the building and having walked to
the back of the [Blue Door Video] store:

> "...I then saw JD short hair (Robert Pinter DOB:
> 11/123/55] standing around and looking at me.  I then
> noticed that he was rubbing his groin area with his
> hand while staring at me. I then used my right hand
> and pulled out of my front pocket pants some Pre-
> recorded buy money and showed Robert.  I then saw
> Robert look at my money, then look at me, then nod his
> head. I then approached Robert and engaged him in a
> sexual related conversation.  Robert asked me what did
> I have for him.  I told him I could give him $50 and
> asked him what did he like to do. He told me he
> enjoyed sucking cock and getting his cock sucked.  I
> told him that I did not feel safe doing that in the
> store and if we could go to my car around the block. I
> told him again that I will give him $50 to suck each
> other off and he agreed. We then left the location and
> I led Robert to the field team where they detained
> him.  I then gave all the details to Sergeant Madison
> and the field team of what had just transpired".

129.   The afore-described written October 10, 2008
recorded statement of Defendant Undercover 31107 describing
what he claims took place and what he related to the
Defendant members of the arrest team, believed to include
Undercover 3117, Defendant Jessica Sterling, Defendant
Michael Madison, Defendant Michael Michilena, and Defendant
Sandra Dailey, as an alleged basis for the arrest of the
Plaintiff is untrue and false in material respects:

> [a] including that he observed the Plaintiff "standing
> around looking at [Undercover 3117]" which was false
> and which the Plaintiff was not doing; [b] including
> that Undercover 3117 "noticed that [the Plaintiff] was

rubbing his groin area with his hand while staring at
me which was a false and which the Plaintiff was not
doing in any of respects described; [c] including that
Undercover "then used [his] right hand and pulled out
of my front right pants pocket some Pre recorded buy
money and showed Robert which did not happen and which
is false and untrue in all respects; [d] including I
then saw Robert look at my money, then look at me,
then nod his head which, in all respects, did not
occur and which is false and untrue; [e] including
Robert asked me what did I have for him which
Plaintiff did not say to Undercover 31107 inside of
the store or otherwise and which is untrue and false;
[f] including "I told him again that I will give him
$50 to suck each other off and he agreed" which not
occur as Defendant Undercover 31107 states it did and
which is false and untrue since Defendant Undercover
raised money only as the Plaintiff, along with
Defendant Undercover 31107, was at the door exiting
the Blue Door Video when, for the first time,
Defendant Undercover raised the matter of giving the
Plaintiff $50 for the Plaintiff to perform a sex act
on Undercover 31107 and which the Plaintiff never, by
words or otherwise, agreed to do so.

130.   When the Plaintiff was walking with Defendant
Undercover 31107, the Plaintiff was going home to his
residence. The Plaintiff never agreed to consensual sex
with Undercover 31107, in words and never agreed to give or
receive any monies in return for performing and/or
receiving sex acts.

131.   In all material respects, the information
described by Defendant Undercover 31107 in his October 10,
2008 "Complaint Follow-Up Information" and the information
verbally transmitted by Defendant Undercover 31107 to
members of the arrest team of which Defendant Undercover
31107 was a fundamental part and without which the unlawful
arrest of the Plaintiff would not have been made, was false
and untrue.

132.   It is believed that approximately eight of
approximately twelve individuals arrested during 2008 at
the Blue Door Video store, were over the age of forty two
[including the Plaintiff].

133.   The actions and conduct of the Officers involved in the Plaintiff's arrest and in the arrests of multiple others over a course of time were propelled by the New York City quality of life offense initiatives including the Mayor and Police Commissioner promoted initiatives to close down adult video stores frequented, disproportionately, by individuals who are believed to be members of the gay, lesbian, bi-sexual and transgender communities.

134.   Those initiatives propelled New York City Police Officers to take actions which are unlawful including making probable cause lacking arrests and otherwise stretching the truth of what transpired during the course of any efforts undertaken by the Police Officers to entrap gay men into engaging in sexual activity and then to accuse them of engaging in acts of prostitution [when nothing of the sort has occurred] and otherwise discriminating against individuals because of their sexual orientation or because of their perceived sexual orientation and/or harassing individuals because of their sexual orientation or their perceived sexual orientation.

135.   It is believed that these policies and practices emanated from the highest levels of the government of the City of New York including it is believed the Mayor himself and it is believed the Office of the Mayor of the City of New York itself and including it is believed the Police Commissioner of the City of New York himself and the Office of the Police Commissioner of the New York City Police Department itself and including it is believed the Chief of Patrol Bureau Manhattan South himself and the Office of the Chief of Patrol Bureau Manhattan South itself and including the head of the Vice Squad in Patrol Bureau Manhattan South and the Commanding Officer of the Organized Crime Bureau of the New York City Police Department.

136.   It is believed that the New York City Police Department Internal Affairs Bureau investigated the arrest of the Plaintiff after it learned, through the media accounts of the Plaintiff's arrest and related comparable arrests.

137.   It is believed that the Internal Affairs Bureau placed its imprimatur on the arrest of the Plaintiff and otherwise declined to investigate the pattern of arrests which had been exposed in the media accounts describing the

Plaintiff's situation and comparable situation [as
described herein].

138.   It is believed that the recommendation of the
Internal Affairs Bureau in the Plaintiff's specific matter
and, as well, the failure of the Internal Affairs Bureau to
investigate the systemic pattern of comparable arrests to
the Plaintiff's arrest as described and reported in the
media were adopted and accepted by the Defendant Chief of
the Department and the Defendant Commissioner, this
notwithstanding that the Defendant Commissioner directed
that, because of issues and concerns and problems with the
policy and practice and approach to arrests of individuals,
disproportionately gay, at adult video stores,
modifications in be made in the policy, practice and
approach.

139. Such acceptance as described by the Defendants
Esposito and Kelly placed the imprimatur of the Department
on the unlawful arrest of the Plaintiff and of the
otherwise problematic and unlawful policy and practice and
approach which propelled the unlawful arrest of the
Plaintiff—and others; and otherwise affirmatively
sanctioned the unlawful arrest of the Plaintiff and the
unlawful policy, practice, and approach which propelled
such.

140.   The City's policies and practices and approach as
described and the actions and conduct related to the arrest
of the Plaintiff and of others comparably and similarly
situated were designed to achieve a collateral purpose and
had nothing whatsoever to do with any allegedly unlawful
conduct by the Plaintiff [because there was no unlawful
conduct on the part of the Plaintiff and no reasonable
competent and prudently acting police officer could have
reasonably and objectively believed that anything which the
Plaintiff did was unlawful].

141.   The Plaintiff was falsely arrested; he was
subjected to malicious prosecution; he was subjected to
malicious abuse of criminal process; he was subjected to
discriminatory and harassing conduct and treatment because
of his status as a gay man and as a member of the gay,
lesbian, bi-sexual and transgender communities; he was
subjected to unreasonable and excessive terms and
conditions of his arrest and custodial imprisonment
including being required, while rear cuffed and seat belted

in, to drive around in a police van vehicle for
approximately four hours rather than transported
immediately after his arrest to a Precinct for post arrest
processing and, then, in lieu of being detained through the
system being released with a Summons or Desk Appearance
Ticket [without conceding that the arrest itself was in any
manner or fashion lawful or constitutional]; and he was
subjected, by his prolonged handcuffing under the
circumstances as described, to excessive and unreasonable
and unnecessary force. Furthermore, he was denied to his
right to frequent and associate with a legitimate business
establishment where he sought to secure otherwise lawful
material.

142. The actions and conduct and the policies and
practices which were associated therewith and which
propelled the same were unlawful and unconstitutional and
violated the Plaintiff's rights –and the rights of others
comparably and similarly situated, under the First, Fourth,
and Fourteenth Amendments to the United States Constitution
and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

143. The actions and conduct and the policies and
practices which were associated therewith and which
propelled the same were unlawful under the laws and
Constitution of the State of New York and/or the City of
New York including false arrest, malicious prosecution,
malicious abuse of criminal process, assault and battery,
excessive force, excessive detention, and discrimination
based on sexual orientation.

144. The Plaintiff suffered humiliation, stress,
anguish, psychological trauma, loss of earnings, physical
pain and suffering and the violation of his constitutional
and civil rights and rights otherwise guaranteed under law.

145. The Plaintiff has not placed a monetary value on
the damages which he suffered as a consequence of the
actions and conduct and policies and practices associated
therewith which propelled such.  However, he deems the
monetary value to be substantial and to include not only
compensatory damages but punitive damages, as well.

146. The Plaintiff has no other adequate remedy at law
but for the institution of this litigation.

V.  CAUSES OF ACTION

A.  FIRST CAUSE OF ACTION

147.  The Plaintiff reiterates Paragraph #'s 1 through 146 and incorporates such by reference herein.

148.  The Plaintiff was unlawfully stopped and detained and entrapped and arrested in violation of his rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

149.  The Plaintiff suffered injuries and damages.

B.  SECOND CAUSE OF ACTION

150.  The Plaintiff reiterates Paragraph #'s 1 through 149 and incorporates such by reference herein.

151.  The Plaintiff was unlawfully stopped and detained and constructively arrested and arrested in violation of his rights as guaranteed under the laws and Constitution of the State of New York.

152.  The Plaintiff suffered injuries and damages.

C.  THIRD CAUSE OF ACTION

153.  The Plaintiff reiterates Paragraph #'s 1 through 152 and incorporates such by reference herein.

154.  The Plaintiff was subjected to discriminatory treatment in violation of his rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

155.  The Plaintiff suffered injuries and damages.

D. FOURTH CAUSE OF ACTION

156.  The Plaintiff reiterates Paragraph #'s 1 through 155 and incorporates such by reference herein.

157.   The Plaintiff was subjected to discriminatory treatment in violation of his rights as guaranteed under the laws and Constitution of the State of New York.

158.   The Plaintiff suffered injuries and damages.

### E.   FIFTH CAUSE OF ACTION

159.   The Plaintiff reiterates Paragraph #'s 1 through 158 and incorporates such by reference herein.

160.   The Plaintiff was subjected to malicious prosecution in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

161.   The Plaintiff suffered injuries and damages.

### F.   SIXTH CAUSE OF ACTION

162.   The Plaintiff reiterates Paragraph #'s 1 through 161 and incorporates such by reference herein.

163.   The Plaintiff was subjected to malicious prosecution in violation of the laws and Constitution of the State of New York.

164.   The Plaintiff suffered injuries and damages.

### G.   SEVENTH CAUSE OF ACTION

165.   The Plaintiff reiterates Paragraph #'s 1 through 164 and incorporates such by reference herein.

166.   The actions taken against the Plaintiff in targeting him, entrapping him, arresting him, taking him into custody and otherwise detaining him and prosecuting him were taken for collateral objectives other than the legitimate objectives associated with an arrest and prosecution.

167.   The Plaintiff was subjected to malicious abuse of criminal process in violation of his rights as guaranteed under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

168.  The Plaintiff suffered injuries and damages.

### H.  EIGHTH CAUSE OF ACTION

169.  The Plaintiff reiterates Paragraph #'s 1 through 168 and incorporates such by reference herein.

170.  The Plaintiff was subjected to malicious abuse of criminal prosecution in violation of the laws and Constitution of the State of New York.

171.  The Plaintiff suffered injuries and damages.

### I.  NINTH CAUSE OF ACTION

172.  The Plaintiff reiterates Paragraph #'s 1 through 171 and incorporates such by reference herein.

173.  The Plaintiff was subjected to excessive and unreasonable detention and to excessive and unnecessary and unreasonable physical force [related to his handcuffing] and to unnecessary and unreasonable and excessive terms and conditions of his seizure [including being required to travel around for several hours before being taken to a Precinct for post arrest processing] in violation of his rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

174.  The Plaintiff suffered injuries and damages.

### J.  TENTH CAUSE OF ACTION

175.  The Plaintiff reiterates Paragraph #'s 1 through 174 and incorporates such by reference herein.

176.  The Plaintiff was subjected to excessive and unreasonable detention and to excessive and unnecessary and unreasonable physical force [related to his handcuffing] and to unnecessary and unreasonable and excessive terms and conditions of his seizure [including being required to travel around for several hours before being taken to a Precinct for post arrest processing] in violation of his rights as guaranteed under the laws and Constitution of the State of New York.

177.  The Plaintiff suffered injuries and damages.

K.    ELEVENTH CAUSE OF ACTION

178.  The Plaintiff reiterates Paragraph #'s 1 through 177 and incorporates such by reference herein.

179.  The Plaintiff was punished for and denied his right "to associate" with the business entities where he desires to do business in violation of his rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

180.  The Plaintiff suffered injuries and damages.

L.    TWELFTH CAUSE OF ACTION

181.  The Plaintiff reiterates Paragraph #'s 1 through 180 and incorporates such by reference herein.

182.  The Plaintiff was punished for and denied his right "to associate" with the business entities where he desires to do business in violation of his rights as guaranteed under the laws and Constitution of the State of New York.

183.  The Plaintiff suffered injuries and damages.

M.    THIRTEENTH CAUSE OF ACTION

184.  The Plaintiff reiterates Paragraph #'s 1 through 183 and incorporates such by reference herein.

185.  The policies, practices and customs herein described propelled the actions and conduct herein. Those policies, practices, and customs violated the Plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

186.  The Plaintiff suffered injuries and damages.

N.    FOURTEENTH CAUSE OF ACTION

187.  The Plaintiff reiterates Paragraph #'s 1 through 186 and incorporates such by reference herein.

188. The actions and conduct and policies, practices and customs herein were negligent and otherwise violative of the Plaintiff's rights under the laws and Constitution of the State of New York.

189. The Plaintiff suffered injuries and damages.

O. FIFTEENTH CAUSE OF ACTION

190. The Plaintiff reiterates Paragraph #'s 1 through 189 and incorporates such by reference herein.

191. Pursuant to and under pendent State law and pendent State claim jurisdiction and independent of the federally based claim against the Defendant City of New York, the Defendant City of New York is responsible, under State law claims, for the actions and conduct of its Defendant Officers, as employees and agents of the City of New York, pursuant to the doctrine of respondeat superior.

192. The Plaintiff suffered injuries and damages.

P. SIXTEENTH CAUSE OF ACTION

193. The Plaintiff reiterates Paragraph #'s 1 through 192 and incorporates such by reference herein.

194. If the City of New York elects to represents its Police Officers, the City of New York uniformly and as a matter of policy and practice indemnifies the Officers for any award of both punitive damages and compensatory damages and pays the settlements of any such litigations [for its Officers] and incurs the costs incurred in defending said litigations [without contributions from the Officers].

195. In return, the Officers are required to cooperate with the City's attorneys and, in substance, to subordinate any interests to those of the City of New York in the context of the litigation.

196. The named individual Defendants are employees and agents of the City of New York and their conduct, as described, was taken in the course of their duties and functions as New York City Police Officers and Command Officers therein and, in their capacities as such, as an agent and employee of the City of New York.

197.   Their actions and conduct, while unlawful and unconstitutional, nonetheless were actions and conduct taken pursuant to the otherwise lawful performance of their duties and functions as an agents and employees of the City of New York.

198.   The Plaintiff is entitled to recover against the City of New York for the conduct of its named and unnamed Officers under the federal claim jurisdiction pursuant to the doctrine of <u>respondeat</u> <u>superior</u>.

199.   The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED: New York, New York
       December 8, 2009

Respectfully submitted,

/s/James I. Meyerson____
JAMES I. MEYERSON
64 Fulton Street @ Suite # 502
New York, New York 10038
[212] 226-3310
[212] 513-1006/FAX
jimeyerson@yahoo.com

ATTORNEY FOR PLAINTIFF
BY:_____

31

TO:
TONY JENERETTE, ESQ.
Senior Counsel
City of New York
Department of Law
Special Federal Litigation Division
100 Church Street-3rd Floor
New York, New York 10007
[212] 788-0993
[212] 788-9776
tjeneret@law.nyc.gov
ATTORNEY FOR ALREADY APPEARING DEFENDANT PARTIES
BY:_____

CERTIFICATE OF SERVICE

James I. Meyerson, attorney for the Plaintiff, certifies that on the 8th day of December, 2009, I did serve a copy of the foregoing Plaintiff's First Amended Complaint upon counsel for the already appearing Defendant parties by having the same hand, along with the endorsed Supplemental Summons, delivered to her office and post office address as follows: Tonya Jenerette, Esq., Senior, Counsel, City of New York, Department of Law, Special Federal Litigation Division, 100 Church Street-4[th] Floor Window, New York, New York 10007.

DATED: New York, New York
       December 8, 2009

                         Respectfully submitted,

                         /s/James I. Meyerson_____
                         JAMES I. MEYERSON
                         64 Fulton Street @ Suite # 502
                         New York, New York 10038
                         [212] 226-3310
                         [212] 513-1006/FAX
                         jimeyerson@yahoo.com
                         ATTORNEY FOR PLAINTIFF
                         BY:_____

33