UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ROBERT PINTER,

                                              Plaintiff,

-against-

THE CITY OF NEW YORK, a municipal entity, NEW YORK CITY UNDERCOVER POLICE OFFICER # 31107, NEW YORK CITY POLICE OFFICERS "JOHN DOES," individually and in their official capacities, NEW YORK CITY MICHAEL BLOOMBERG, individually and in his official Capacity, ASSISTANT CHIEF RAYMOND DIAZ, Commanding Officer Of Patrol Borough Manhattan South, Individually and in his official capacity, CAPTAIN "JOE" BRAILLE, Commander of the Vice Squad of Patrol Borough Manhattan South, individually and in his official capacity, CHIEF ANTHONY IZZO, Commander of the Organized Crime Bureau of the New York City Police Department, individually and in his official capacity, CHIEF JOSEPH ESPOSITO, individually and in his official capacity, BRIAN CONROY, individually and in his official capacity as Deputy Chief of the New York City Police Department's Vice Enforcement Division, and SHARI C. HYMAN, individually and in her official Capacity as Director of the New York City Mayor's Office of Special Enforcement, DETECTIVE JESSICA STERLING, Shield # 6132, individually and in her Official capacity, SERGEANT MICHAEL MADISON, Shield # 4321, individually and in his official capacity, DETECTIVE MICHAEL MICHILENA, Shield # 1409, Individually and in his official capacity, DETECTIVE SANDRA DAILEY, Shield # 1069, individually and in Her official capacity,

                                              Defendants.

----------------------------------------------------------------x

**CITY DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

**09 CV 7841 (CM)**

        1.  Defendants City of New York, Michael Bloomberg, Raymond Diaz, Steven Braille, Anthony Izzo, Joseph Esposito, Brian Conroy, Shari C. Hyman, Jessica Sterling, Michael Madison, Michael Michilena, Sandra Daily and Undercover Officer 31107 ("City

Defendants") submit this statement pursuant to Local Civil Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern District of New York, to set forth material facts[1] as to which they contend there are no genuine issues to be tried.

2. Plaintiff Robert Pinter commenced this action on September 11, 2009, alleging that he was falsely arrested and maliciously prosecuted in violation of his civil rights. *See Declaration of Tonya Jenerette, dated January 15, 2010 ("Jenerette Decl."), Exhibit A.*

3. Plaintiff claims that he was falsely arrested pursuant to a policy by the New York City Mayor's Office of Special Enforcement and the New York city Police Department to entrap gay men into prostitution arrests for the purpose of supporting nuisance abatement proceedings aimed at shutting down legitimate businesses that cater to or are frequented by members of the gay, lesbian, bi-sexual and transgender communities. *See Jenerette Decl.* Exhibit A at ¶¶ 84 – 85

4. Plaintiff claims that he was falsely arrested for prostitution in order to bolster the City's nuisance abatement lawsuit against Blue Door Video Store as it sought to close that business. *See Jenerette Decl.* Exhibit A at ¶¶ 100 – 104.

---

[1] The following facts are drawn from the complaint and plaintiff's deposition, which was taken on December 4, 2009, pursuant to this Court's scheduling order.  Facts are also drawn from court records of nuisance abatement proceedings initiated against Blue Door Video Store by the Mayor's Officer of Special Enforcement, as well as stipulations of settlement between the City and Blue Door Video.  The Court make take judicial notice of the content of these documents because plaintiff refers to the proceedings in his complaint and relies upon them in bringing his lawsuit. *Bancroft v. City of Mount Vernon*, 2009 U.S. Dist. LEXIS 112652 (S.D.N.Y. November 23, 2009) (J. McMahon).  The documents were produced to plaintiff as part of the City's Rule 26(a) Disclosures on January 7, 2010.

Defendants do not concede the truthfulness of any of plaintiff's allegations; mindful, however, of the Court's obligation to construe the allegations as true for the purpose of this motion, defendants set forth the allegations as pled or testified to by plaintiff.

5. On December 1, 2009, the City answered the complaint and filed a notice of motion for summary judgment based upon qualified immunity.

6. Pursuant to the Court's order, on December 3, 2009, Mr. Pinter was deposed at the offices of the New York City Corporation Counsel. *Jenerette Del.* Exhibit D.

7. On December 9, 2009, plaintiff filed an amended complaint (the "Complaint") adding factual allegations that were not included in his initial complaint and about which he was not deposed. *Jenerette Decl.* Exhibit B.

8. On or about January 15, 2010, the City filed an answer to the complaint on behalf of all defendants.

9. Undercover Officer # 31107 is an officer with the Manhattan South Vice Command in the New York City Police Department. *Jenerette Decl.* Exhibit B at ¶ 129.

10. Jessica Sterling is a detective with the Manhattan South Vice Command in the New York City Police Department and a part of the team that arrested plaintiff Robert Pinter. *Jenerette Decl.* Exhibit B at ¶ 129.

11. Michael Madison is a sergeant with the Manhattan South Vice Command in the New York City Police Department and a part of the team that arrested plaintiff Robert Pinter. *Jenerette Decl.* Exhibit B at ¶ 129.

12. Michael Michilena is a detective with the Manhattan South Vice Command in the New York City Police Department and a part of the team that arrested plaintiff Robert Pinter. *Jenerette Decl.* Exhibit B at ¶ 129.

13. Sandra Dailey is a detective with the Manhattan South Vice Command in the New York City Police Department and a part of the team that arrested plaintiff Robert Pinter. *Jenerette Decl.* Exhibit B at ¶ 129.

14. Shari C. Hyman is the Deputy Criminal Justice Coordinator and Director of the Mayor's Office of Special Enforcement.  In her role as Director of the Office of Special Enforcement, she initiated the nuisance abatement proceedings against Blue Door Video Store.  *Jenerette Decl.* Exhibit B at ¶ 103.

### *Plaintiff Robert Pinter's Arrest*

15. On October 10, 2008 at approximately 7:30 p.m., Plaintiff was arrested by detectives from the Manhattan South Vice Squad.  Robert Pinter Deposition Transcript at pgs. 15 – 16, attached as Exhibit D to the Declaration of Tonya Jenerette (the "Jenerette Decl.")

16. On October 10, 2008, plaintiff arrived at the Blue Door Video Store and walked to the back of the main floor to look for an adult video. *Jenerette Decl.* Exhibit D at pp. 94-95.

17. Blue Door Video Store is located at 87 1st Avenue between Fifth and Sixth Streets in Manhattan.  *Jenerette Decl.* Exhibit B at ¶ 29.

18. This was not Pinter's first visit to the Blue Door Video Store. *Jenerette Decl.* Exhibit D at pg. 84-85.

19. The Blue Door Video Store sells and rents general entertainment videos aimed at both a heterosexual and gay clientele.  *Jenerette Decl.* Exhibit D at pgs 87-88).

20. The Blue Door Video Store is comprised of both a main floor and a cellar. *Jenerette Decl.*, Exhibit D at pp. 90-91).

21. At the front of the main floor of the Blue Door Video Store, there are kiosks displaying Hollywood feature films and general entertainment videos for rent or purchase. *Jenerette Decl.* Exhibit D at pp. 86-88).

22. In the back section of the main floor, there are kiosks featuring adult films for sale or rent. The adult films cater to both a heterosexual and gay clientele; vertical blinds separate the adult films from the general entertainment films. *Jenerette Decl.*, Exhibit D at pp. 86-88.

23. Just beyond the section of the main floor that displays adult videos is a small hallway with booths. Each booth contains a small TV screen and a seat where people pay money to view adult movies in private. *Jenerette Decl.*, Exhibit D at pp. 89-90.

24. In the downstairs or cellar level of the Blue Door Video Store, there is a large room with chairs, booths similar to those set up on the main floor and a large flat screen television that plays gay male adult films. *Jenerette Decl.*, Exhibit D at pp. 90 - 92. The plaintiff has observed men masturbating while viewing adult films in that room. *Id.* at p. 93.

25. While perusing the DVDs at the Blue Door Video Store on October 10, 2008, plaintiff overheard a conversation. When he looked around the corner, he observed two men engaged in conversation a few aisles down from him. *Jenerette Decl.* Exhibit D at pp. 95. One of the men was a tall, white male approximately 65 years-old. The other was a young Asian male, later identified as Under Cover Officer 31107 ("UC 31107"). *See Jenerette Decl.* Exhibit D at pg. 95-97.

26. UC 31107 had his cell phone open and appeared to be entering the tall white male's telephone number into it. *See Jenerette Decl.* Exhibit D at pg. 96.

27. Pinter returned to shopping for a DVD. A few moments later, plaintiff looked up and saw that the Asian male, UC 31107, was standing just a few feet away from him and staring at the plaintiff. *Jenerette Decl.* Exhibit D at pg. 98. UC 31107 was not accompanied by the tall white male. *Id.*

28. Pinter and UC 31107 made eye contact, smiled and took a few steps towards each other. *Jenerette Decl.* Exhibit D at pg. 99.

29. At that point, UC 31107 complimented Pinter on his good looks and asked him what he "likes to do." Pinter replied "I'm a cocksucker" and "I like sucking cock." *Jenerette Decl.* Exhibit D at p. 99-100.

30. Pinter stated that he was "a cocksucker" in response to the question because he believed UC 31107 was interested in engaging in a sex act and not in learning about what he enjoyed doing socially. *Jenerette Decl*. Exhibit D at pg. 100.

31. UC 31107 told Pinter that he also enjoyed performing fellatio, but stated that he was nervous and did not want to do anything in the store. He also stated that he had a car parked nearby. *Jenerette Decl*. Exhibit D at pg. 101.

32. At that point, Pinter "took a step towards the exit," expecting UC 31107 to follow him. *Jenerette Decl.* Exhibit D at pgs. 101 - 102.

33. Pinter and UC 31107 walked together towards the exit. *Jenerette Decl.* Exhibit D at pg. 105-106.

34. Before leaving the store, UC 31107 said to Pinter; "I want to pay you $50 to suck your dick." *Jenerette Decl*. Exhibit D at pg. 108, 193.

35. Pinter took note of the statement, felt "suspicious" that UC 31107 had just offered him money and thought it odd because he was not used "to being approached and solicited in that manner." *Jenerette Decl*., Exhibit D at pgs. 108-109.

36. Pinter said nothing in response but walked outside with UC 31107. *Jenerette Decl.* Exhibit D at pg. 108, 193.

37. Pinter testified that, after the undercover officer "said that he wanted to pay me, we just exited the store together." *Jenerette Decl*. Exhibit D at pg. 110.

38. During an October 15, 2008 counseling session with Patricia Duffett of the National Coalition of Anti-Violence programs, Pinter described his encounter with UC 31107 as follows:

> Robert called looking for help because he was falsely arrested for prostitution and believed that the police targeted him because he is gay. He described looking at videos at the Blue Door a few doors from his home, a young Asian man approached him and offered $50 for him to suck Robert's dick. He proposed that they do it in his car. Robert did not agree or disagree but he walked outside with the mane [*sic*]."

*Jenerette Decl.* Exhibit D at pg. 193.

39. Pinter testified that, "as soon as we exited the store, he motioned, he said my car is parked over there." *Jenerette Decl*., Exhibit D at pg. 110. Pinter and UC 31107 then walked together in the direction of the car. *Jenerette Decl*., Exhibit D at pg. 111.

40. Although Pinter made a mental decision not to engage in a sexual act with UC 31107, he never communicated that decision to the undercover officer as they walked together. *Jenerette Decl*. Exhibit D at pg. 109 - 110.

41. Instead, after UC 31107 offered Pinter money in exchange for fellatio, he and Pinter "exited the store together and continued talking" and walking. *Jenerette Decl*. Exhibit D at pg. 110.

42. As Pinter and UC 31107 walked together, they engaged in conversation about their respective penis sizes. *Jenerette Decl*. Exhibit D at pg. 111 – 113.

43. UC 31107 asked Pinter "how big" he was. Plaintiff answered that he was "big enough" and then asked UC 31107 "how big are you?" The officer replied that he was of average size. *Jenerette Decl*. Exhibit D at pg. 111-112.

44. Plaintiff and UC 31107 next discussed their respective ages. When Pinter told UC 31107 to guess his age, the officer guessed 35. Pinter told UC 31107 to "switch those two numbers around and you'll be much closer to my age." *Jenerette Decl.* Exhibit D at pg. 112. Pinter then guessed UC 31107's age at 25; the officer told him he was 29. *Jenerette Decl.* Exhibit D at pg. 114.

45. As Pinter and UC 31107 walked together in the direction of the officer's car, Mr. Pinter decided that he was simply proceeding home. But he never communicated that decision to the undercover officer. *Jenerette Decl.* Exhibit D at pg. 113- 114.

46. As they walked together, Mr. Pinter never told the undercover officer that he did not wish to engage in fellatio with him or to receive money in exchange for it. *Jenerette Decl.* Exhibit D at pg. 114.

47. Pinter and UC 31107 walked north on First Avenue to the corner of Sixth Street, then crossed First Avenue and continued walking east on Sixth Street. *Jenerette Decl.* Exhibit D at pg.110 -111. Pinter and UC 31107 walked together over a distance of approximately 50 to 125 feet. *Jenerette Decl.* Exhibit D at pg. 114 and 116 - 117. During that time, Mr. Pinter felt that he was free to walk away from the undercover officer but did not do so. *Jenerette Decl.* Exhibit D at pg. 115.

48. Shortly after Pinter and the undercover officer began walking down East 6th Street, Mr. Pinter was arrested by detectives from the Manhattan South Vice Squad. *Jenerette Decl.* Exhibit D at pg. 121-123; Exhibit B at ¶ 129.

49. Pinter was informed that he was under arrest for soliciting prostitution. *Jenerette Decl.* Exhibit D at pg. 126. He was charged with a violation of Penal Law 230.00 *Jenerette Decl.* Exhibits C and E.

50. The Manhattan South Vice Squad team that arrested Pinter was comprised of UC 31107; Detective Jessica Sterling; Detective Michael Michilena; Detective Sandra Dailey; and Sergeant Michael Madison. *Jenerette Decl*. Exhibit B at ¶ 129.

51. Pinter was placed in a prisoner van and transported to the 7th Precinct for arrest processing. *Jenerette Decl*. Exhibit D at pgs. 144 – 145.

52. After riding in the prisoner van for approximately one hour, Pinter's handcuffs tightened, causing his hands to become cold and numb.  *Jenerette Decl*. Exhibit D at pgs. 128 - 131.  He asked the detectives driving the van to remove or loosen the handcuffs. One of the officers stated that they would not loosen the cuffs because they would be arriving at the precinct shortly.  *Jenerette Decl*. Exhibit D at pgs. 131-132.

53. At approximately 3:00 a.m., Pinter was transported to Manhattan Central Booking for arraignment.  *Jenerette Decl.* Exhibit D at pg. 158.

54. At Manhattan Central booking, Pinter met with attorney Eric Williams, who explained that he could plead not guilty to the prostitution charge, return with an attorney and be assigned a trial date.  *Jenerette Decl.* Exhibit D at pg. 158.

55. Pinter then appeared before the Honorable Judge James Gibbons who informed him of his right to go to trial on the prostitution charge; ensured that he wished to plead guilty to the lesser charge, and explained his sentence .  *Jenerette Decl.* Exhibit C.

56. On October 11, 2008, Pinter pled guilty to the lesser charge of disorderly conduct before the Honorable James Gibbons. *Jenerette Decl.* Exhibit C;  Exhibit D at pgs. 158 – 159.

57. On October 21, 2008, Pinter was sentenced to five counseling sessions and a fine of $120.00 by the Honorable Judge Weinberg at the Manhattan Community Court. *Jenerette Decl.* Exhibit F.

58. On or about April 17, 2009, Pinter moved to vacate his conviction on the grounds that it was obtained in violation of his right to due process, fundamental fairness and effective assistance of counsel. *Jenerette Decl.* Exhibit G.

59. On or about June 22, 2009, the Manhattan District Attorney's office filed its Affirmation and Response to Pinter's motion. The district attorney's office stated that there is "no legal basis for the relief sought by" Pinter; that the "Court conducted the defendant's plea allocution in a clear and thorough manner and the minutes of the proceedings establish that the defendant made a knowing, intelligent and voluntary plea;" and that "the People believe that there was probable cause for the defendant's arrest and prosecution for the offense charged." *See Jenerette Declaration* Exhibit P.

### *The Nuisance Abatement Proceedings Against Blue Door Video*

60. On or around April 21, 2008, the New York City Department of Buildings informed Dina Chiarelli, owner of the building located at 87 1st Avenue, that the tenant Blue Door Video was in violation of the certificate of occupancy for operating an adult entertainment theater in a residential district. *Jenerette Decl.* Exhibit I. More specifically, the cellar of the Blue Door Video Store contained a large room with 8 to 13 chairs arranged before a large television screen showing gay male adult films. *Id.*

61. On June 12, 2008, the New York City Mayor's Office of Special Enforcement commenced an action pursuant to Title 7, Chapter 7, of the Administrative Code (the "Nuisance Abatement Law") to abate a public and criminal nuisance situated on the first

floor and cellar of the Blue Door Video Store, located at 87 1st Avenue in Manhattan, New York.  *Jenerette Decl*. Exhibits J and K.

62. Actions under the Nuisance Abatement Law are both in rem and in personam proceedings since they address a continuous condition at a premise, not the isolated criminal activities of any individual.  Jenerette Decl. Exhibit J.

63. The nuisance abatement proceeding was based upon the illegal adult theater; approximately 10 arrests for prostitution and one arrest for possession of marijuana.  *Jenerette Decl.* Exhibits J and K.

64. On June 20, 2008, Dina Chiarella and the tenant Blue Door Video entered into a Stipulation of Settlement, Judgment and Order with the City of New York.  *Jenerette Decl.* Exhibit J.

65. Pursuant to the settlement, Blue Door Video agreed to take certain steps to abate the public nuisance, including dismantling the theater, installing surveillance cameras and posting signs forbidding prostitution.  The settlement also provided that there would be periodic, unannounced investigations of the premises by undercover officers of the New York City Police Department.  The Stipulation of Settlement was signed by the Honorable Nicholas Figueroa.  *Jenerette Decl.* Exhibit J.

66. On November 19, 2008, the Mayor's Office Of Special Enforcement moved to vacate the settlement and continue nuisance abatement proceedings against Blue Door Video for violations of the June 20, 2008 Stipulation of Settlement.  *Jenerette Decl.* Exhibit K.

67. Special Enforcement alleged that Blue Door Video violated the June 20, 2008 settlement agreement after investigations by undercover New York City police detectives resulted in two prostitution arrests. One of those arrests was the plaintiff, Robert Pinter. *Jenerette Decl.* Exhibit K.

68. On or about November 19, 2008, The Honorable Nicholas Figueroa issued an order to show cause to Blue Door Video. Jenerette Decl. Exhibit L.

69. On or about December 5, 2008, Special Enforcement and representatives of Blue Door Video appeared before the Honorable Nicholas Figueroa. *Jenerette Decl.* Exhibit M.

70. On or about December 17, 2008, the Mayor's Office of Special Enforcement and Blue Door Video entered into a Stipulation of Settlement wherein Blue Door Video agreed to pay a fine of $5,000 and to post a bond of $40,000. *Jenerette Decl.* Exhibit N.

71. Pursuant to the settlement, Blue Door Video admitted the truth of the allegations set forth in the City's November 19, 2008 motion for an order to show cause. *Jenerette Decl*. Exhibit N.

72. On April 2, 2009, Dina Chiarali, owner of 87 1st Street, the premises where Blue Door Video is located, entered into a third and final settlement agreement with the City adjourning the nuisance abatement proceedings. *Jenerette Decl*. Exhibit O.

Dated: New York, New York
January 15, 2010

                                          MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street,
New York, York 10007
(212) 788-0993

By: _____/s/_____
Tonya Jenerette
Senior Corporation Counsel