IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

ROBERT PINTER,

    PLAINTIFF

    vs

THE CITY OF NEW YORK,
etc., et al.,

    DEFENDANTS

09 Civ 7841 (CM)(THK)
PLAINTIFF'S CONSOLIDATED
RESPONSE TO THE DEFENDANTS'
RULE 56.1 STATEMENT OF
UNCONTESTED FACTS AND
COUNTER RULE 56.1 STATEMENT
OF MATERIAL UNCONTESTED
FACTS INTER-RELATED THERETO

---

Now comes Plaintiff Robert Pinter, by and through his
attorney James I. Meyerson, 64 Fulton Street-Suite # 502,
New York, New York 10038 [212] 226-3310/[212] 513-1006
(FAX)/email jimeyerson@yahoo.com, and hereby and herein
responds to the City Defendants' Rule 56.1 Statement of
Undisputed Facts as follows.

I. STATEMENT OF RESERVATION OF RIGHTS AND OBJECTIONS

The Plaintiff deems much of that which is set forth in
the "City Defendants' Rule 56.1 Statement of Uncontested
Facts" to be immaterial and irrelevant to the resolution of
the claims in this litigation and, as well, to the defenses
asserted in the litigation including the qualified immunity
defense.

That being stated, the Plaintiff will respond to the
various Paragraphs without conceding the materiality or

relevance of the material set forth in any one Paragraph as possessing the requisite relevance and materiality to the resolution of the claims and/or defenses including the qualified immunity defense.

Moreover and to the extent that the Defendants' attorney asserts facts in any one Paragraph in isolation and without context and which thereby leaves a misimpression as to the fact or facts set forth therein, the Plaintiff's attorney will, if appropriate, provide additional factual reference to give the context without which context the misimpression is left as to what is asserted in the Complaint, the Amended Complaint, or the Plaintiff's deposition testimonies.

## II. PLAINTIFF'S RESPONSE TO THE CITY DEFENDANTS' STATEMENT OF UNDISUPTED FACTS PURSUANT TO RULE 56.1

1. As to that which is set forth in <u>Paragraph # 1</u>[1] and to the extent that the Defendants are described

---

[1] To the extent that the Defendants assert in footnote one [1] of the City Defendants' Rule 56.1 Statement of Uncontested Facts that the "following facts are drawn from the complaint...", it is believed that, while the term "complaint" is utilized and is listed as Exhibit # "A" to the Jenerette Declaration, the City's attorney is referring in reality to the Plaintiff's "First Amended Complaint" which is listed as Exhibit # "B" to the Jenerette Declaration.

  At some other point in the document, the City's attorney seems to clarify the reference to the "complaint" and equate such to the Plaintiff's First Amended Complaint and not the initial Complaint.

collectively by their attorney as the "City Defendants",
Plaintiff does not contest such and believes that, as a
matter of law, such, among other things, reflects he
reality that the City of New York is the real party in
interest in this litigation.[2]

---

[2] Although the City is among several Defendants named in the
litigation the others of whom all are employees of the City
of New York, see: First Amended Complaint Allegation #'s
12-14, the Plaintiff's position is that the City is, in
fact and law, the real party in interest in this
litigation. See: Sixteenth Cause of Action.
  The City's attorney controls the litigation not solely
for the Defendant City but also for all the individually
named City employee- Defendants. In fact the Defendant City
requires that, in return for representation and
indemnification, the City employee-Defendants agree to
subordinate their respective individual interests to the
interest of the City. In other words, the City's interests
are paramount in the litigation.
  In return, the City of New York agrees that it will pay
whatever judgment if any is secured against any one
individual employee-Defendant or any settlement otherwise
paid out.
  It is believed that in another recent litigation in this
Court, the City's attorneys acknowledged that, over the
course of at least a decade if not more, the City has paid
the judgments of all officers it has represented in federal
civil rights police misconduct litigations in this Court
and in the Eastern District, including both compensatory
damages and punitive damages, again reflecting the real
party in interest status of the City. See: Gyasi v. The
City of New York, et al./05 Civ 9453 (SAS)/SDNY. (Exhibit #
J to the Meyerson Declaration).
  Per the outstanding and now stayed Plaintiff Initial
Discovery Requests, the Plaintiff is seeking discovery in
this regard to up-date the data relative thereto.
  Given the City's real party in interest reality, the
Plaintiff believes that such make the whole concept of an
individual's qualified immunity defense and the inter-
related Monell policy construct and claim immaterial and
legally irrelevant thereby obviating the need to address

3

2.  As to that which is set forth in Paragraph # 2, the Plaintiff does not contest that he commenced his litigation on September 11, 2009 and that, among other claims, he alleged that he was falsely arrested and maliciously prosecuted.[3]

---

and resolve the very confusing and complex qualified immunity defense and the very complicated and inter-related Monell policy municipal liability claim.

[3] In addition to the false arrest and malicious prosecution causes of action, the Plaintiff asserts multiple other federal constitutional and State law claims, see: First Amended Complaint Allegation #'s 147-199, including malicious abuse of criminal process, excessive handcuffing force, and their constitutional equivalents, interference with his First Amendment right of association [in terms of being free to be at and shop at a publicly available adult video retail store of his own choosing without law enforcement interference therewith], and sexual orientation based discrimination.

In addition and associated with his several claims against the line police officers involved in his arrest and all associated therewith, the Plaintiff asserts supervisory claims against several named command and management personnel in the New York City Police Department and/or the City government, including the Mayor and Shari Hyman, the Director of the Mayor's Office of Special Enforcement; and Monell policy municipal liability claims related to the Plaintiff's arrest and the use of handcuffing force associated therewith which it is alleged propelled the conduct to which the Plaintiff was subjected.

Except for their "absolute immunity" defense offered up with respect to Defendant Hyman, it does not appear that the City Defendants' pending Motion addresses the supervisory claims and any associated qualified immunity defense inter-related therewith except in the context of the false arrest and malicious prosecution claims and then only based on the position that there was probable cause for the arrest and prosecution and that therefore the qualified immunity is irrelevant because in the claims in those respects fail as a matter of law.

3. As to that which is set forth in Paragraph # 3, the Plaintiff does not contest Paragraph # 3 although such is not the sole and only policy claims which the Plaintiff asserts.[4]

4. As to that which is set forth in Paragraph # 4, the Plaintiff does not contest that, among other allegations he makes, is the claim that he was falsely arrested for prostitution. See: First Amended Complaint Allegation #'s 80-109, 120-125,132-143.[5]

---

[4] For example and to the extent that the Plaintiff alleges that he was subjected to excessive continuous rear handcuffing force for a period four or five hours while he was in custody in a police vehicle and was being driven around and about while the police were engaged in activities which had nothing to do with the Plaintiff or his arrest, the Plaintiff claims that the handcuffing force (as described) was the result of a policy and practice of the City of New York.

Thus and to the extent therefore that the Defendant Officers contend that they did such pursuant to the authority and/or training of the Police Department and/or the authority and training of the Police Department and therefore might be entitled to qualified immunity, the City of New York itself would be liable nonetheless because a municipal entity does not possess the individual's qualified immunity defense for its unlawful policies which propel unconstitutional conduct.

The "City Defendants" do not address the excessive force claim and qualified immunity defense or the associated Monell policy claim in their pending Motion.

[5] The Plaintiff further asserts and alleges that he was arrested for the City's "collateral purpose" of generating arrest statistics to be utilized in nuisance abatement lawsuit brought by the City of New York against an adult video store known as the Blue Door. Such is a basis for his

5.  As to that which is set forth in <u>Paragraph # 5</u>,
the Plaintiff does not contest Paragraph # 5.[6]

6.  As to that which is set forth in <u>Paragraph # 6</u>,
the Plaintiff does not contest Paragraph # 6.

7.  As for that which is set forth in <u>Paragraph # 7</u>,
the Plaintiff does not contest that on December 9, 2009 the
Plaintiff filed an Amended Complaint [which is referenced

---

malicious abuse of criminal process claim and its inter-
related supervisory and <u>Monell</u> policy claims
 The "collateral purpose" allegation attaches to the
Plaintiff's malicious abuse of criminal process claim and
not, <u>per se</u>, to his false arrest and malicious prosecution
claims which do not require a collateral purpose but simply
and only a lack of probable cause whatever the
motivation/purpose for the unlawful arrest and, in the
context of the malicious prosecution claim, in addition to
the lack of probable cause, a favorable merits based
outcome to the Plaintiff's criminal proceeding and the
element of malice on the part of the Defendant officer(s),
the latter of which can be inferred from the absence of
probable cause and the fabrication of a false underlying
factual predicate for the arrest.

[6] On December 2, 2009, the then named City Defendants filed
an Amended Answer to the Complaint.

by the City Defendants' counsel as the "Complaint"].[7]

---

[7] While the Plaintiff does admit that he added certain specific facts that were not previously pled in the initial Complaint in the First Amended Complaint, those facts were related to factual allegations previously pled and were discoverable in the context of the Plaintiff's deposition. Some of the material was in fact addressed by the Plaintiff and/or his counsel and/or the Defendants' attorney during the deposition providing the City Defendants' attorney the opportunity to explore those factual matters. In fact, Defendants' attorney did explore some of the same during the course of the deposition; and otherwise could have explored such but elected not to do so.

Many of those limited additional factual matters, which found their way into the First Amended Complaint, were contained in materials that, prior to the deposition, had been provided to the City Defendants' attorney through a series of Rule 26 Voluntary Disclosures and Supplements thereto [with multiple attachments associated therewith and inter-related thereto].

To the extent therefore that the City Defendants' attorney is implying that at the Plaintiff's deposition she was not able to explore specific factual matters which found there way into the First Amended Complaint filed within days after the deposition, the Plaintiff's attorney takes issue with such and expressed that disagreement with her at the time of the filing and service of the Amended Complaint and a discussion which then ensued about the same.

For example, in the post deposition First Amended Complaint, the Plaintiff references to and quotes from a document known as the Post Arrest "Complaint Follow Up Informational" which was prepared by Defendant Undercover Officer # 31107 on the date his arrest of the Plaintiff (date and time contemporaneous therewith).

After quoting the Defendant Undercover Officer's Complaint Follow-Up Informational in the Amended Complaint, the Plaintiff asserts that it is a fabricated fact narrative and untrue and specifically and particularly identified in the First Amended Complaint that which is fabricated and untruthful (all of which was, in substance, described in the initial Complaint). See: First Amended Complaint Allegation #'s 126-131.

During his December 3, 2009 deposition, the Plaintiff specifically described how he came about to obtain the

8.  As to that which is set forth in Paragraph # 8,
the Plaintiff concedes that on January 15, 2010, the City
filed an answer to the Plaintiff's First Amended Complaint

---

document and he otherwise referenced to the document in
response to a question or questions from the City's
attorney.

The Plaintiff does not describe the document by its
"formal" denomination but only as a document in which the
Defendant Undercover Officer describes and memorializes
what the Defendant Undercover Officer asserts transpired in
the Blue Door adult video store and which he indicates he
reported to his fellow and sister field operation arrest
team colleagues as the  probable cause fact predicate basis
for his belief that the Plaintiff had engaged in an act of
prostitution by accepting money in exchange for sexual
activity. See: Plaintiff's deposition testimonies
transcript at pages 10-22 (Exhibit # A); and the copy of
the Defendant Undercover Officer # 31107 prepared October
10, 2008 "Complaint Follow-Up Informational." (Exhibit #
C).

On December 3, 2009, subsequent to the December 3, 2009
deposition, the Plaintiff's attorney provided the document
to the City Defendants' counsel as the sole attachment to
Plaintiff' Eleventh Supplemental Rule 26 Voluntary
Disclosures. See: Exhibit # K.

The Plaintiff's counsel had only just received such from
the Plaintiff on or about that date. It is a document which
it is assumed that the City Defendants' counsel already had
in her possession since it was executed by her client and
provides the alleged factual basis on which he justified
his arrest of the Plaintiff on October 10, 2008 and what he
conveyed in that regard to the members of the field
operation arrest team.

The point is, as with virtually all of the limited
additional factual averments which were set forth in the
First Amended Complaint that were not specifically set
forth in the initial Complaint, the City Defendants'
attorney had information prior to the deposition in that
regard and/or questioned the Plaintiff about such in the
deposition or could have questioned him about such and,
therefore, her actual and/or implied protests of prejudice
by the post deposition filing of the First Amended
Complaint run hollow and are baseless.

on behalf of all of the Defendants [the City's attorney makes reference to the First Amended Complaint as the "Complaint"].

9. As to that which is set forth in <u>Paragraph #'s 9 through 13</u>, the Plaintiff does not have personal knowledge on which to either admit or deny such. The Plaintiff believes that which is set forth in Paragraph #'s 9 through 13 is accurate and he does not contest such.[8]

10. As to that which is set forth in <u>Paragraph # 14</u>, Plaintiff does not have personal knowledge on which to either admit or deny that Shari C. Hyman is the Deputy Criminal Justice Coordinator and Director of the Mayor's Office of Special Enforcement. The Plaintiff believes such to be accurate and the Plaintiff does not contest such.[9]

---

[8] Defendant Jessica Sterling is described in the New York City Police Department "Arrest Report" generated by the New York City Police Department "Omniform System", as the "arresting officer" who asserts that, as the assigned "arresting officer", she "was informed" by Defendant Undercover Officer # 31107, that the "Deft did offer/agree to perform oral sex on UC # 31107 in exchange for $50.00 United States Currency", see: Exhibit # D, an assertion which Plaintiff vigorously denies.
   Defendant Sergeant Michael Madison is described as the supervising officer whose name appears on the "Arrest Report" and whose name and signature appears on the October 10, 2008 Complaint Follow Up Informational. See: Exhibit # C.

[9] To the extent that it is further stated in Paragraph # 14 that "in her role as Director of the Office of Special Enforcement, she initiated the nuisance abatement

11. As to that which is set forth in Paragraph # 15, the Plaintiff admits that he was arrested by detectives from the Manhattan South Vice Squad.

The Plaintiff admits moreover that he was arrested on October 10, 2008 and that such is set forth at pages 15-16 of his deposition testimonies transcript. See: Exhibit # A. The Plaintiff does not contest that the arrest took place at or about 7:15 to 7:30 P.M. on the date in question although such is not described or set forth in the Plaintiff's deposition testimonies.[10]

---

proceedings against Blue Door Video Store", the Plaintiff contests such and believes that it was the City of New York, as an entity, and not Shari Hyman, which, as an entity, initiated the civil nuisance abatement proceedings against Blue Door Video Store.

The focus of the Plaintiff's claims against Shari Hyman and the Defendant Mayor is that they promulgated and adopted and implemented ancillary unlawful policies in pursuing the otherwise legitimate policy of civil nuisance abatement litigation policy to close down, among others, the Blue Door retail video store, the consequence of which propelled the unlawful arrest of the Plaintiff and all associated therewith.

[10] The Omniform Arrest Report states that the arrest took place at 19:25 hours or 7:25 P.M. See: Exhibit # D. The Complaint Follow Up Informational indicates that at or about 1915 hours or 7:15 P.M., Defendant Undercover Officer 31107 "did perform a walk up investigation" when he "entered the building and walked to the back of the store..." See: Exhibit # C. See also: Plaintiff's testimonies transcript at page 145 (Exhibit # A) where the Plaintiff testified that it was 7:15 P.M. when he was "picked up" on October 10, 2008, the date on which he was arrested on "East 6th Street".

12. As to that which is set forth in Paragraph # 16, Plaintiff admits that which is set forth in Paragraph # 16.

13. As to that which is set forth in Paragraph # 17, Plaintiff does not contest Paragraph # 17.

14. As to that which is set forth in Paragraph # 18, Plaintiff does not contest Paragraph # 18 and admits that prior to October 10, 2008 he had been at the Blue Door Video Store on other occasions.

15. As to that which is set forth in Paragraph # 19, the Plaintiff contests the term "aimed" as utilized in Paragraph # 19. The Plaintiff does not contest that the Blue Door Video Store retails in the rental and sale of "general entertainment videos and films" and adult video materials.

16. As to that which is set forth in Paragraph # 20, the Plaintiff does not contest that the Blue Door Video store has a street level main floor and a floor below the street level main floor [referred to by the Defendants' attorney as a "cellar"].

17. As to that which is set forth in Paragraph # 21, the Plaintiff admits that which is set forth in Paragraph # 21.

18. As to that which is set forth in Paragraph # 22, except for the term "cater" as utilized in Paragraph # 22,

the Plaintiff does not contest that which is set forth therein and he otherwise admits that the Blue Door Video rents and sells, among other things, adult video materials.

19. As to that which is set forth in <u>Paragraph # 23</u>, Plaintiff does not contest that which is set forth in Paragraph # 23.

20. As to that which is set forth in <u>Paragraph # 24</u>, the Plaintiff does not contest that which is set forth in Paragraph # 24.[11]

21. As to that which is set forth in <u>Paragraph #'s, 25-27</u>, the Plaintiff does not contest such except to the extent that the phrase a "few feet away" is utilized in Paragraph # 27.[12]

---

[11] To the extent that the Paragraph suggests that only "gay male adult films" are shown on a large flat screen located in the lower level of the Blue Door Video Store, the Plaintiff does not admit to such and he does not know what the City's attorney means, one way or the other, when referencing to "gay male adult films"; and, further, the Plaintiff has no idea whatsoever what the Blue Door Video store did in displaying videos in the "basement" and what kinds of films were displayed in the "basement".
   The Plaintiff has observed what he has described as "gay male pornography" playing on the flat screen television in the lower level of the Blue Door Video Store.

[12] At 97-98 of the Plaintiff's deposition testimonies transcript (Exhibit # A), the Plaintiff estimates that, when he first observed/felt the young Asian individual staring at him (the Plaintiff), the young Asian individual was at the head of the aisle, approximately ten (10) feet

22. As to that which is set forth in Paragraph # 28, the Plaintiff does not contest that, after he felt Defendant Undercover Police Officer # 31107 staring at him approximately ten feet away from where the Plaintiff was standing, he and the Defendant Undercover Officer # 31107 made eye contact with each other. Defendant Undercover Officer # 31107 initially smiled at the Plaintiff who in turn then returned the smile. The Defendant Undercover Officer # 31107 then initially took a few steps toward the Plaintiff and the Plaintiff, then, took a few steps toward Defendant Undercover Officer # 31107. See: Plaintiff's deposition testimonies (Exhibit # A).

23. As to that which is set forth in Paragraph #'s 29 and 30, the Plaintiff contests such because, as set forth, the representations avoid the full context of what the Plaintiff testified to in response to a series of questions posed to the Plaintiff by the City's attorney about what occurred thereby avoiding the total context and leaving a misimpression of that which took place.[13]

---

from where the Plaintiff was standing looking at DVD videos on the shelf. See: Exhibit A.

[13] Thus, The Plaintiff testified that, after the exchange of smiles as initiated by the Defendant Undercover Officer and after they walked a few steps toward each other per the initiation of such movement by the Defendant Undercover Officer, "he said to me, oh, you're a good-looking guy. He said, what do you like to do? And I said, "oh, thank you,

24.   As to that which is set forth in Paragraph #'s 31 and 32, the Plaintiff contests such because, again, the representations fail to incorporate the context of the Plaintiff's responses to a series of questions posed to him by the City's attorney thereby leaving a misimpression of what transpired.[14]

---

you're good-looking, too. I told him I was a cocksucker and I liked to suck cock". See: Plaintiff's deposition testimonies transcript at pages 99-101 (Exhibit # A).

  Continuing the Plaintiff testified: "Q: Why did you say that to him? A. In answer to his question. Q: You didn't understand him to be asking what you like to do socially? A. We were engaged in a flirtation. Q. How did you establish that you were engaged in a flirtation? A. By the fact that he smiled at me. Q.  When he asked what did you like to do, you didn't think that he might have been asking what you would like to do on a date, for example? A. No. Q. You understood him to be seeking to engage you in a sexual act? A. That is correct. Q. Why did you assume that? A. Well, because of the things that I had already told you, that he smiled, told me I was handsome and asked me what I liked to do. That's it. Q. Had you had encounters like that before October 10th, 2008 at the Blue Door Video Store? A. No." Id.

[14] Thus, the Plaintiff testified that, in response to the Plaintiff's initial comments after Defendant Undercover Officer # 31107 initiated the flirtation and the Plaintiff responded and engaged therein, "he said, 'oh, I like to such cock, too", that's what he said. And he said, but I am nervous. I don't want to do anything in the store". See: Plaintiff's deposition testimonies at page 101 (Exhibit # A).

  Continuing, the Plaintiff testified: "Q. What did you say? A. Actually he said one more thing.  He said, I have a car parked nearby. Q. What did you say? Nothing.  Q. You said nothing in response to that? A. No. Q. What happened next? A. I took a step towards the exit. Q. What do you mean you took a step towards the exit? Did you take a step toward him? A. He was still on my right. I walked, took a

25.  As to that which is set forth in Paragraph # 32, the Plaintiff contests such without providing the context described and set forth above because, in isolation and without the context, the representation said forth in Paragraph # 32 leaves a misimpression, particularly the reference therein that the Plaintiff expected Defendant

---

step and walked toward the exit. Q. Why did you do that? A. To leave the store. Q. Did you not want to engage in cocksucking with him? A. At that point it was still a possibility that it might occur.  Q. You expected him to follow you as you took a step towards the exit, when you took your step towards the exit? A. Yes. Q. Did you start walking towards the exit because he said he wanted to have sex in his car which was parked nearby? A.  It was a possibility. Q. What do you mean when you say it was a possibility? A. It means that it might or might not occur. Q. But your intention at that moment was to leave the store to go to his car with him; is that correct? A. it was a possibility.  Q. What do you mean it was a possibility?  A. It may or may not occur." See: Plaintiff's deposition testimonies transcript at pages 101-102 (Exhibit # A).
 Continuing, at page 105 of the Plaintiff's deposition testimonies transcript: Q: What was your intention of when you took a step toward the exit of Blue Door Video? A. To exit the store. Q. With or without the Asian male. A. I don't know. Q. Why don't you know? That was up to him? Q. What happened next. He also moved towards the exit next to me. A. The two of you walked together towards the exit. A. Yes. Q. Did you engage in conversation as you walked to the exit. A. No. Q. No words were exchanged? A. No. Q.  As you're walking together, did you talk about anything, did you engage in conversation? A. No. Q. At any point while you were in the store with the Asian male, did you discuss money? A. No. Q. Did he mention money to you? A. Yes. Q. What did he say? A. I want to pay you $50 to suck your dick. Q. Where were you standing when he said that? A. At the door". See: Plaintiff's deposition transcript testimonies at pages 105-107 (Exhibit # A).

Undercover Officer 31107 "to follow him". Actually, the testimony is to the contrary.[15]

26.  As to that which is set forth in <u>Paragraph # 33</u>, the Plaintiff does not contest that the Plaintiff and Defendant Undercover Officer # 31107 walked toward the exit but contest the representation that they were walking "together" and the implications which the City's attorney attaches to such. The Plaintiff admits that they walked toward the door and eventually arrived at the door.

27.  As to that which is set forth in <u>Paragraph # 34</u>, the Plaintiff describes how the scenario unfolded as set forth above in the exact deposition testimonies. The Plaintiff cannot admit to the representations set forth in Paragraph # 34 without the full context of the Plaintiff's responses to the series of questions posed to him by the City's attorney which provides the full context and without which full context the representation leaves a misimpression.

---

[15] In that regard, the Plaintiff had no idea whatsoever what Defendant Undercover Officer # 31107 was going to do and the Plaintiff had no expectation one way or the other except that it was a "possibility" that the Defendant Undercover Officer # 31107 would leave the store and possibly have consensual sexual activity without there being any mention at that time of any money, the latter of which took place when, at the door, the Defendant Undercover Officer # 31107 first raised that topic.

28.  As for that which is set forth in <u>Paragraph # 35</u>, the Plaintiff contests the statement in isolation and without the context for the statement in Paragraph 35 which context was elicited by a series of questions from the City's attorney and without which context, the statement leaves a misimpression.[16]

---

[16] "Q. What did he say? A. I want to pay you $50 to suck your dick. Q. Where were you standing when he said that? A. At the door. Q. At the door of the Blue Door Video Store? A. Yes. Where you inside the store when he said that to you? A. That's correct, yes. What did you say to him in response? A. Nothing. Q. What happened next? A. He opened the door. Q. Did you walk away from him? A. I walked through the door outside. Q. Tell me again what he said? A. I want to pay you $50 to suck your dick. Q. Approximately how long had you been walking with him at the moment he said that? A. Do you mean from when we were standing in the back to this point, how long? A. Yes. How much time elapsed? A. A few seconds. Q. How close to the door were you standing when he said that to you? A. We were right at the door.  Q. What did you say in response? A. Nothing. Q. Why didn't you say anything? A. I was thinking. Q. What were you thinking about? A. My first though was he had asked me to pay him. Q. Did you ask him to clarify what he meant? A. I didn't respond to any of it at all. Then I was suspicious, you know. Q. What were you suspicious of? A. That he had offered me money. What I discovered was that he had just offered me money. Q.  What did that make you suspicious of? A. I just, you know—just—it seemed odd to me, not use to being approached and solicited in that manner. Q. Did you say anything to him? A. No, I did not. Q. Did you ask him why he offered you money? A. No, I did not. Q. Did you tell him that you didn't wish to give or receive money in exchange for sucking his cock? A. No, I did not. I was mentally reassessing what was going on and had decided that this was over. Any possibility of really engaging in anything with him was over at that point." See: Plaintiff's deposition testimonies transcript at pages 107-109 (Exhibit # A).

29. As to that which is set forth in Paragraph #'s 36 and 37 and within the context described above and described hereinafter, the Plaintiff does not context that which is set forth in Paragraph #'s 36 and 37 (so long as context is attached to it).[17]

30. As to that which is set forth in Paragraph # 38, the Plaintiff admits that he did have post arrest counseling sessions with Patricia Duffett at the New York City Anti Violence Project to address the emotional fallout which he was suffering from the arrest incident and all associated therewith. Such included a telephone "session" on October 15, 2008. The City's attorney does not indicate that such was a telephone "session". Otherwise, the Plaintiff cannot admit to the accuracy of Ms. Duffett's notes of that telephone session and what the Plaintiff said in that telephone session.[18]

---

[17] "Q. Did you tell him that you didn't wish to give or receive money in exchange for sucking cock? A. No. I did not. I was mentally reassessing what was going on and had decided that this was over. Any possibility of really engaging in anything with him was over at that point. Q. You decided that in your head? A. Yes, I did. Q. What did you do in response to that decision? A. Continuing exiting and walking. Q. Did you communicate that decision to him? A. I did not. Q. Why not? A. He made a statement when we left the store." See: Plaintiff's deposition testimonies transcript at pages 109-110 (Exhibit # A).

[18] The Plaintiff does admit that he described in various sessions with Ms. Duffett what transpired consistent with

31.  As to that which is set forth in <u>Paragraph # 39</u>, the Plaintiff admits that, while he did state that which is set forth in Paragraph # 39, it is taken out of context and the representation therefore leaves a misimpression of what the Plaintiff stated in context.  Therefore and as set forth, the Plaintiff contests the representation in the out of context isolation.[19]

---

the details he provided to the City's attorney during the course of his deposition but he cannot either admit or deny the accuracy and context associated therewith of that which Ms. Duffett wrote in her notes relative to the Plaintiff's accounting to her because the Plaintiff does not have any personal knowledge in that regard (as to the accuracy of the totality of what at any one moment or session the Plaintiff recounted to Ms. Duffett about the event).

Within the context of what the Plaintiff otherwise told Ms. Duffett about the arrest incident, the isolated notation is not fully accurate and complete but does describe, generally and in part, what occurred but does not represent the full context and detail of what occurred and what he otherwise told Ms. Duffett in the counseling sessions.

[19] "Q. You decided in your head that whatever was going to happen between the two of you wasn't going to happen; is that correct? A. That's correct. Q. Did you communicate that decision to him? A. I did not. Why didn't you communicate that decision to him? A. Okay, let me try and think.  We weren't standing around like having a discussion. That all happened very quickly. After he asked or said that he wanted to pay me, we just exited the store together and he continued talking. Q. You continued walking with him? A. That is correct. Q. Why didn't you walk away from him? A. As soon as we exited the store, he motioned, he said my car is parked over there. Q. In which direction did he point? A. It was in the same direction I was walking to get to my apartment. Q. To the left or the right? A. It was across First Avenue. Q. What do you mean when you say across First Avenue, going east—A. Yes, going east on 6th

32.  As to that which is set forth in Paragraph # 40 and within the context otherwise described and set forth herein, the Plaintiff does not contest that which is set forth in Paragraph # 40 and admits to such.

33.  As to that which is set forth in Paragraph # 41 and within the context otherwise described and set forth herein, the Plaintiff does not contest that which is set forth in Paragraph # 41 although the Plaintiff rejects and does contest the "implications" of the word "together" when viewed in the fuller context.

34.  As to that which is set forth in Paragraph #'s 42, 43, 44, 45, 46, and 47 and as considered in the context otherwise described herein, the Plaintiff does not contest that which is set forth therein.[20]

---

Street between First Avenue and Avenue A. Q. Where is your apartment, located again? A. On 8th Street between Avenue B and C. Q. He motioned, and then did the two of you cross First Avenue together? A. Yes." See: Plaintiff's deposition testimonies transcript at pages 110-111 (Exhibit # A).
[20] Within context, from the time that the Plaintiff exited the Blue Door Video Store to the point where he is pushed against a fence and arrested, the Plaintiff walked perhaps forty yards [one hundred and twenty five feet]. Moreover no more than one minute, if that, elapsed from the point in time when the Plaintiff exited the Blue Door Video Store to the point in time when he was pushed against the fence an arrested. For a portion of time there was silence and the Plaintiff was walking home toward his apartment, albeit with Defendant Undercover Officer # 31105 in his proximity. See: Plaintiff's deposition testimonies transcript at pages 114-117 (Exhibit # A).

35.   As to that which is set forth in Paragraph #'s 48, 49, and 50, the Plaintiff does not contest the same and, within context otherwise testified to by the Plaintiff in his deposition testimonies, admits the same.[21]

36.   As to that which is set forth in Paragraph #'s 51, 52, and 53, the Plaintiff does not contest such and admits the same in the fuller context of what transpired before he was transported to the 7th Precinct.[22]

------

[21] The Plaintiff testified that, out of the corner of his eye, he observed two men rushing toward him and propelling him against a cyclone fence, face forward toward the Village Manner Housing Development. He was closer to First Avenue, approximately fifty feet into 6th Street on 6th Street. He did not know where Defendant Undercover Officer # 31107 was situated. The men said nothing to the Plaintiff. The Plaintiff felt the bag, which he was carrying, being lifted off his shoulder and hands going into his pockets. The Plaintiff felt he was being robbed or mugged and that the Asian man may have been part of such and had set him up.
The Plaintiff was then able to see that one of the men had a badge around his neck and, then, realized or thought that the man was a policeman.  The Plaintiff then assumed he was being arrested and asked why he was being arrested. He received no response. The monies, which were in the Plaintiffs pocket, were removed from his pocket and counted in the presence of the Plaintiff at which time the Plaintiff was rear cuffed and taken to a police vehicle when he was then informed he was being arrested for prostitution to which the Plaintiff responded: "You-ve got to be kidding me.  I was in the store shopping for a DVD. I was minding my own business, your officer approached me, butted his nose into my business, and created this whole incident". See: Plaintiff's deposition testimonies transcript at pages 117-126 (Exhibit # A).

[22] After being placed in the van it became quite warm and the Plaintiff informed the Officers, then in the van, of

37.   As to that which is set forth in <u>Paragraph #'s 54,</u> <u>55, 56, and 57</u>, the Plaintiff does not contest such and admits to the same although, as with everything else described, there is a fuller context.[23]

---

such and a blower was put on that remedied the condition. About an hour into his detention and custodial confinement in the police vehicle, the handcuffs were getting tighter and tighter and tighter and the Plaintiff's hands were getting cold and numb.

The Plaintiff, who was belted in and rear cuffed, asked if the cuffs could be loosened or taken off.  An Officer responded, no, they could not be loosened or taken off and that they would be at the Precinct "soon".

This exchange, after approximately one hour, occurred before any other individuals had been placed in the van. The van had been in a stop and start movement pattern as of that point in time.  Eventually two other individuals, both women [one Hispanic and one Asian], were placed in the van, each at a separate location to which the van had traveled. See: Plaintiff's deposition testimonies transcript at pages 126-132 (Exhibit # A).  The Plaintiff was in the van, continuously rear cuffed and retrained by a seatbelt, for over four (4) hours. See: Plaintiff's deposition testimonies transcript at page 136 (Exhibit # A).

[23] The Plaintiff was assigned a Legal Aid attorney, Eric Williams, with whom he spoke for a very brief period because of the enormous case load which Mr. Williams was handling at the time of the Plaintiff's arraignment.  The Plaintiff, who was very much concerned about the implications of the charge on his New York State issued message therapist license, informed Mr. Williams that he was not a prostitute and that he believed that he had been set up by the police. The Plaintiff informed Mr. Williams that he was not going to plead guilty to prostitution.

The Plaintiff was informed that he could plead not guilty, that he could retain a counsel and return to court, and he could go to trial. The Plaintiff was informed that a plea deal might be offered and the Plaintiff did inform Mr. Williams about his massage therapist license and the Plaintiff's concern that the arrest and charge could have on such. Mr. Williams informed the Plaintiff that this

38.  As to that which is set forth in Paragraph # 57, the Plaintiff, within the context not otherwise set forth therein, does not contest such and admits such.[24]

39.  As to that which is set forth in Paragraph # 58, the Plaintiff admits such. As with everything of course, there is context which further explains and amplifies on the basic proposition set forth in the Paragraph and which, in doing so, describes the basic proposition in a much more comprehensive and truth telling manner and fashion.

---

would come down to his word against the officer's word and, if convicted, the Plaintiff would have a record, the latter of which caused the Plaintiff concerns with respect to his State issued message therapist license. See: Plaintiff's deposition testimonies transcript at pages 152-159 (Exhibit # A).

The Plaintiff, who had not slept for thirty six hours, had not taken his Lipitor medication,  and who was otherwise enormously stressed out and concerned and otherwise confused, plead guilty to disorderly conduct and appeared in front of the presiding arraignment Court Judge, James Gibson,  and entered his plea even though, at that point, he was not fully cognizant of all of the options and ramifications because of the very, very limited exchange which he had with his attorney regarding the matter, prior to the arraignment, and, then, once he appeared at arraignment and the plea was offered.  See: Plaintiff's deposition testimonies transcript at pages 160-163 (Exhibit # A).

[24] See: Plaintiff's deposition testimonies transcript at pages 162-175 (Exhibit # A) in which the Plaintiff describes his continued confusion and his efforts to try and understand, after his arraignment, what had transpired at his arraignment and what was to take place when he appeared in the Community Court for sentencing and what, then, did occur and all of the confusion in the Plaintiff's mind associated therewith.

40.  As to that which is set forth in Paragraph # 59, the Plaintiff does not contest that which is set forth therein.[25]

---

[25] On the other hand and notwithstanding that the Plaintiff does not contest that which is set forth therein, the Plaintiff submits that such is not everything which New York County District Attorney Robert Morgenthau's Office set forth in its papers related to the Plaintiff's efforts to withdraw the plea.

Among other things, District Attorney Morgenthau's Office stated that, on a merits based consideration of the case against the Plaintiff, it could not prove a case against the Plaintiff beyond a reasonable doubt.

Specifically, Assistant District Attorney Gregory LeDonne stated in his Affirmation and Response to Robert Pinter's Motion to Vacate his October 11, 2008 plea to disorderly conduct: "...the People have concluded that it is unlikely that the defendant went to the location of the occurrence with the intent to solicit money for sex, as supported by his age (52 upon arrest), lack of a prior record for prostitution-related offenses, and overall law-abiding history. Furthermore, the People recently dismissed three pending cases with circumstances similar to those of the case at bar because the People concluded that it would be difficult to prove the guilt of the defendants in those cases beyond a reasonable doubt at trial." See: Exhibit H.

Furthermore and to the extent that the District Attorney was claiming that there was probable cause for the arrest of the Plaintiff, such was based on what the Defendant Undercover Officer # 31107 stated occurred which is materially contested by the Plaintiff and which probable cause fact predicate narrative of Defendant Undercover Officer # 31107, is, according to the Plaintiff, a totally fabricated account of what transpired inside of the Blue Door Video Store.

Not insignificantly, the City's attorney does not even propose, as an uncontested material fact, the fact of Defendant Undercover Officer # 31107's October 10, 2008 recorded probable cause fact predicate justification for his arrest of the Plaintiff as set forth in the Undercover Officer's Complaint Follow-Up Informational. See: Exhibit # C. It is a critical uncontested fact and it is, for the

41.  As to that which is set forth in <u>Paragraph # s 60,</u>
<u>61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, and 72</u>, the
Plaintiff does not have any personal knowledge related to
the matters set forth therein. The Plaintiff does not
contest that on occasions he has patronized the Blue Door
adult video retail store. The Plaintiff does not contest
that he was arrested on the street, approximately 120 feet
from the Blue Door adult video retail store, for alleged
unlawful prostitution activity that he was accused of
engaging in by Defendant Undercover Officer # 31107 inside
of the location of the Blue Door Video Store.

Furthermore, the Plaintiff admits that the City of New
York commenced a civil nuisance abatement litigation
against the Blue Door Retail Store in the Supreme Court of
the State of New York, County of New York and that, among
evidence that the City was required to have in order to
succeed in its civil action against the Blue Door video
store was the fact of multiple arrests of multiple
individuals, including the Plaintiff's arrest, for alleged
prostitution inside the Blue Door video store.[26]

---

City's attorney, as if never even existed. See also:
Exhibit #'s D, E, and F.
[26] The fact of arrests for prostitution at the Blue Door
video retail store were a crucial and critical evidential
factor in the City's civil nuisance abatement litigation
and was, at least in the theory of the Plaintiff's claims

In responding to the City Defendants Rule 56.1

Statement of Undisputed Facts, the Plaintiff does not

concede or admit that any or all of the proposed undisputed

facts are either relevant or material to the resolution of

---

and the allegations contained in his Complaint and First
Amended Complaint, the non legitimate collateral purpose
for his arrest since he did nothing unlawful to be arrested
but, even if there was sufficient probable cause for his
arrest, the arrest was, ultimately, not designed to address
his wrongful conduct but rather to achieve the collateral
purpose of providing evidence in support of the City's
civil nuisance abatement litigation against the Blue Door
adult video store. See: Undercover Officer's November 19,
2008 Affidavit in the civil nuisance abatement litigation
(Exhibit # B).

Most importantly and what is left out of the fore-going
Paragraphs is that the Blue Door never admitted in the June
20, 2008 Stipulation of the Discontinuance of the civil
nuisance abatement litigation that it had engaged in wrong
doing. See: June 20, 2008 Stipulation where it states
that Janaka K. Nanayakkara and East Side Video, Inc., d/b/a
Blue Door Video entered into the Stipulation "without
admitting any wrongdoing or liability".

Moreover and to the extent that the Blue Door Video
admitted in a December, 2009 Stipulation the truth of
allegations contained in the November 19, 2008 Show Cause
Order based on allegations contained in the papers
associated therewith including the fact that there was an
Affidavit of Defendant Undercover Officer # 31107 which
sets forth a factual narrative for the arrest of the
Plaintiff (See: Exhibit # B), quite obviously the Blue Door
was not admitting to the truth or falsity of the factual
narrative of Defendant Undercover Officer # 31107 on which
he based his arrest of the Plaintiff on October 10, 2008
but was simply admitting to the truth of the fact that
Undercover Officer # 31105 asserted that the Plaintiff
engaged in unlawful conduct inside of the Blue Door adult
video store on that date; not to the truth or falsity of
the factual assertions set forth in the Affidavit narrative
or documents attached thereto regarding the Plaintiff.

the pending Motion or to the litigation as a whole or any one or all of the claims encompassed therein; nor does the Plaintiff concede or admit that the facts and evidence associated therewith are admissible evidence.

Rather, the Plaintiff reserves all objections as to materiality, relevance, and admissibility of evidence and does not waive any objections as to materiality, relevance, and admissibility.

IV. PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL AND RELEVANT FACTS WHICH PRECLUDE A GRANT OF SUMMARY JUDGMENT SOME OF WHICH FACTS WERE OMITTED FROM THE CITY DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS

1.  The Plaintiff was arrested on October 10, 2008 at approximately 7:15 P.M. See: Plaintiff's deposition testimonies transcript at page 80 (Exhibit # A). See also: Plaintiff's First Amended Complaint Allegation #'s 2, 27.

2.  The Plaintiff was arrested on October 10, 2008 outside of the Blue Door adult video store. See: Plaintiff's deposition testimonies transcript at pages 105- 126. (Exhibit # A). See also: Plaintiff's First Amended Complaint Allegation #'s 42-47.

3.  The Blue Door adult video store is located at 87 1st Avenue, New York City, New York proximate to the intersection of First Avenue and 6th Street. See: Plaintiff's deposition testimonies transcript at pages 85-

86 (Exhibit # A). See also: Misdemeanor Complaint (Exhibit # F); November 19, 2008 Affidavit of Defendant Undercover Office # 31107 (Exhibit # B).

4. The Plaintiff was arrested on Sixth Street in the vicinity of 1st Avenue, a location proximate to the Blue Door Video store wherein the Plaintiff had been and from which the Plaintiff had exited. See: Plaintiff's deposition testimonies transcript at pages 105-126 (Exhibit # A).

5. The Plaintiff was arrested based on conduct which Undercover Officer # 31107 stated, on personal knowledge of Undercover Officer # 31107, took place inside of the Blue Door adult video store. See: Defendant Undercover Officer # 31107's October 10, 2008 memorialized Complaint Follow-Up Informational (Exhibit # C);and Defendant Undercover Officer # 31107's November 19, 2008 executed Affidavit (Exhibit # B).

6. In connection with the October 10, 2008 arrest of the Plaintiff, Defendant Undercover Officer # 31107 memorialized in writing, on October 10, 2008, a factual narrative in which he described the alleged Plaintiff conduct which propelled the arrest of the Plaintiff by the Defendants including Defendant Undercover Officer # 31107. Id.

7. The narrative by Defendant Undercover Officer # 31107 is memorialized in a New York City Police Department document known as a "Complaint Follow-Up Informational" and is designated as Police Department form PD 313-081b (REV 2-86)-31. Id.

8. The narrative memorialized by Defendant Undercover Officer # 31107 states:

> 1. On Friday, October 10, 2008 at approximately 1915 hours, I UC # 311017, did perform a walk up investigation at the above location and was met with positive results. The circumstances are as follows...

> 2. I entered the building and walked to the back of the store. I saw a bunch of Dvd's on the shelves of pornographic material. I then saw JD short hair (Robert Pinter DOB: 11/23/55) standing around and looking at me. I then noticed that he was rubbing his groin area with his hand while staring at me. I then used my right hand and pulled out of my right front pocket some Pre recorded buy money and showed Robert. I then saw Robert look at my money, then look at me, then nod his head. I then approached Robert and engaged him in a sexual conversation. Robert asked me what did I have for him. I told him I could give him $50 and asked him what did he like to do. He told me he enjoyed sucking cock and getting his cock sucked. I told him that I did not feel safe doing that in the store and if we could go to my car around the block. I then told him again that I will give him $50 to suck each other off and he agreed. We then left the location and I led Robert to the field team where they detained him. I then gave all the details to Sgt. Madison and the field team of what had transpired.

> 3. For your information. Id.

9. On October 11, 2008, New York City Police Officer Lenor Thompson, Shield # 24158, executed a Misdemeanor Criminal Court Complaint, in the matter of The People of the State of New York against Robert Pinter (M52), ECAB # 920791, Criminal Court # 2008NY 075734, in which she stated that upon information and belief, the source of which is the supporting deposition of Undercover, Shield # 31107 of MSVES, to be filed with this instrument, Robert Pinter committed the act of prostitution (one count) in that "On October 10, 2008 at or about 19:15 hours located at 87 1st Avenue in the County and State of New York...Undercover, shield # 31107 of the MSVES states that defendant [Robert Pinter] agreed to engage in Sexual Conduct with Undercover, Shield # 31107 of the MSVES, to wit: fellatio in exchange for $50.00 U.S. currency". See: Misdemeanor Complaint (Exhibit # F).

10. The Plaintiff's accounting of the "event" which lead to his arrest and to the commencement of the criminal proceeding is materially different in all relevant respects to that which is set forth by Defendant Undercover Officer # 31107 in his October 10, 2008 Complaint Follow Up Informational narrative. See: Plaintiff's deposition testimonies transcript at pages 80-126 (Exhibit # A).

11.   On November 19, 2008, Undercover Officer # 31107 executed an Affidavit in a Show Cause proceeding encaptioned and known as The City of New York, etc., et ano vs Chiarelli, et al. which Show Cause proceeding was part and parcel of the civil nuisance abatement litigation commenced by the City of New York against the Blue Door adult video store under the same caption. See: November 19, 2008 Affidavit executed by Defendant Undercover Officer # 31107 (Exhibit # B).

12.   The civil nuisance abatement proceeding and the associated Show Cause proceeding instituted by the City of New York against the Blue Door adult video store was commenced in the Supreme Court of the State of New York and the County of New York on June 12, 2008 and was assigned the Index # 401340/2008. See: June 20, 2008 Stipulation of Settlement of the June 12, 2008 civil nuisance abatement litigation against, among other, the Blue Door Video retail store. See: Attachments to Jenerette Declaration.

13.   The Show Cause proceeding associated with the civil nuisance abatement litigation was commenced on November 19, 2008 and was based, in significant part, on the Affidavit executed by Defendant Undercover # 31107 and what he claimed took place in the Blue Door adult video store on October 10, 2008. See: April 20, 2009 Stipulation

and Order of Settlement of the civil nuisance abatement litigation related Show Cause Order.

14. In his November 19, 2008 executed Affidavit, Defendant Undercover Officer # 31107 sets forth that which he memorialized in the October 10, 2008 Complaint Follow-Up Informational. See: November 19, 2008 executed Affidavit of Defendant Undercover Office # 31107. See: Exhibit #'s B and C.

15. It is believed that the Complaint Follow-Up Information was attached to the Affidavit. Id.

16. It is a material fact that is not in dispute that the Plaintiff contests in all material and relevant respects the conduct attributed to him by Defendant Undercover Officer # 31105 as the basis on which Undercover Officer # 31107 asserts he arrested Plaintiff and the basis on which the Show Cause civil nuisance abatement proceeding in November, 2008 was commenced against the Blue Door adult video store.[27] See: Plaintiff's deposition testimonies transcript, supra. See also: First Amended Complaint Allegations, supra.

---

[27] Moreover, the conduct attributed to the Plaintiff by Undercover Police Officer # 31107as recorded and memorialized in the October 10, 2008 Complaint Follow-Up Informational is the conduct which Defendant Undercover Officer # 31107 reported to the other members of the field operation arrest team of which he was a part. See: Complaint Follow-Up Informational document. Id.

18. Furthermore, it is believed the conduct attributed to the Plaintiff by Undercover Police Officer # 31105 as recorded and memorialized in the October 10, 2008 Complaint Follow-Up Information was the conduct which Undercover Police Officer # 31105 provided to the New York County District Attorney's Office as the factual basis for his arrest of the Plaintiff and the commencement of the Criminal Court proceedings against the Plaintiff. See: Exhibit #'s C, D, E, and F.

19. On October 10, 2008, Undercover Officer # 31107 executed a "Prostitution Supporting Deposition" in which he stated under penalty of law that "Defendant stated in my presence" that he "agreed to engage in sexual conduct with me, to wit: Fellatio, in exchange for $50 United States currency". See: Exhibit # E.

20. On April 16, 2009, the Plaintiff executed an Affidavit in support of his Motion to Vacate a Plea to the violation of disorderly conduct which was entered at his post prostitution October 10, 2008 arrest arraignment on October 11, 2008. See: Exhibit # I.

21. Prior thereto, the Plaintiff and many other individuals met with public officials including among others New York State Senator Thomas Duane and City Council Speaker Christine Quinn. Moreover, along with those

officials among others, the Plaintiff met with members of the New York County District Attorney's Office including, among others, then District Attorney Morgenthau himself. See: Exhibit # I.

22. Many news articles appeared related to the Plaintiff's arrest and the arrests of comparable individuals, disproportionate numbers of whom were older gay individual, over a course of time including, over that course of time, individuals arrested for alleged prostitution at the Blue Door store where the Plaintiff. See: Exhibit # I.

23. As a consequence of the public disclosure of the Plaintiff's arrest and the arrests of others [as described in news articles], the Plaintiff was contacted by the Internal Affairs Bureau of the New York City Police Department and he gave an interview, in the presence of his attorney, regarding the matter to officers assigned to the Internal Affairs Bureau. See: Plaintiff's deposition testimonies at pages 175-190 (Exhibit # A).

24. It is believed that the Officers involved in the Plaintiff's arrest and otherwise associated therewith were exonerated of any wrong-doing. Id. Moreover, it is believed that the City of New York did not undertake to review the arrests of others who, over a course of time,

were arrested under comparable circumstances describing the Plaintiff's arrest and involving, among others, Defendant Undercover Officer # 31105. Id.

25.   On June 22, 2009 the New York County District Attorney's Office made a submission to the Criminal Court in which it did not oppose the Plaintiff's efforts to have a previously made disorderly conduct plea [entered at the time of the Plaintiff's arraignment] vacated and to have the prostitution charge dismissed and indicated that, if the plea was vacated, the District Attorney's Office would move to dismiss the prostitution charge. See: Exhibit # H.

26.   Based on what the Defendant Undercover Officer described in his October 10, 2008 executed Follow Up Informational and his October 10, 2008 Prostitution Supporting Affidavit, the New York County District Attorney's Office had prepared a Misdemeanor Complaint believing that, based on what the Undercover Officer stated, such provided a probable cause justification for the arrest. See: Exhibit #'s C, E and F.

27.   In its June 22, 2009 submission to the Criminal Court, the New York County District Attorney's Office described its merits based evaluation of the Plaintiff's Criminal Court charge and concluded that, as with other comparable cases describing alleged similar conduct

involving three other individuals, it did not believe that it could prove a case against the Plaintiff beyond a reasonable doubt. See: Exhibit # H.

28. On June 22, 2008, the Criminal Court granted the Plaintiff's Motion to Vacate and dismissed the prostitution charge against the Plaintiff and sealed the records. See: Exhibit # G.

DATED: New York, New York
January 26, 2010

Respectfully submitted,

/s/ James I. Meyerson

JAMES I. MEYERSON
64 Fulton Street-Suite # 502
New York, New York 10038
[212] 226-3310
[212] 513-1006/FAX
jimeyerson@yahoo.com
ATTORNEY FOR PLAINTIFF
BY:_____