**UNITED STATES DISTRICT COURT**
**SOUTHERN  DISTRICT OF NEW YORK**
------------------------------------------------------ X

ROBERT PINTER,

Plaintiff,

- against -

THE CITY OF NEW YORK, *et al.*,

Defendants.

------------------------------------------------------ X

**OPINION AND ORDER**

**09 Civ. 7841 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.      INTRODUCTION**

On October 10, 2008, detectives from the Manhattan South Vice Enforcement Squad of the New York City Police Department ("NYPD") arrested Robert Pinter for prostitution, following an encounter between Pinter and Undercover Officer ("UC") 31107 at the Blue Door Video Store ("Blue Door"). Following twenty-three hours of post-arrest detention and thirty-six sleepless hours, Pinter pled guilty to a non-criminal violation of disorderly conduct in exchange for a conditional discharge.[1]  Several months after his arrest, Pinter filed

---

[1]      Pinter now alleges that the NYPD entrapped him and other gay men under similar circumstances.

1

an unopposed motion to vacate his conviction and dismiss the accusatory

instrument.

The District Attorney's Office of New York County ("DANY") did

not oppose Pinter's motion, explaining:

> It is unlikely that [Pinter] went to the location of the
> occurrence with the intent to solicit money for sex, as
> supported by his age (52 upon arrest), lack of prior record
> for prostitution-related offenses, and overall law-abiding
> history.  Furthermore, the People recently dismissed three
> pending cases with circumstances similar to those of the
> case at bar because the People concluded that it would be
> difficult to prove the guilt of defendants in those cases
> beyond a reasonable doubt at trial.[2]

The state criminal court granted Pinter's motion.

Pinter's arrests and others like it led to protests by activists who

charged that the NYPD was targeting gay men and that the arrests were a result of

entrapment.  On February 11, 2009, Pinter and other activists met with local

officials including City Council Speaker Christine Quinn.  Later, activists met with

Senator Thomas Duane and then-District Attorney Robert Morgenthau.  Pinter

alleges that these efforts led the NYPD to enact temporary reforms that have since

---

[2]  *Pinter v. City of New York* ("*Pinter I*"), 710 F. Supp. 2d 408, 412 (S.D.N.Y. 2010), *rev'd*, 448 Fed. App'x 99 (2d Cir. 2011), *cert. denied*, 133 S.Ct. 191 (2012) ("*Pinter II*") (quoting Assistant District Attorney Gregory LeDonne's Affirmation and Response to Defendant Pinter's Motion to Vacate Conviction, *People v. Pinter*, No. 2008NY075734 ¶ 5).

been reversed.[3]

In a Second Amended Complaint filed on October 19, 2010, Pinter brings sixteen federal and state claims against the City of New York, the Mayor, and a number of NYPD officials, supervisors, and officers.[4]  Pinter's claims may be categorized as follows: (i) false arrest and unlawful stop in violation of state law and the Fourth and Fourteenth Amendments;[5] (ii) discriminatory treatment based on Pinter's sexual orientation in violation of state law and the First and Fourteenth Amendments;[6] (iii) malicious prosecution in violation of state law and the Fourth Amendment;[7] (iv) malicious abuse of process in violation of state law and the

---

[3]       *See id.* at 417; Plaintiff's Response and Counter Rule 56.1 Statement to the Collective Defendant Parties' Rule 56.1 Statement ("Pl. 56.1") ¶ 43.

[4]       *See* Second Amended Complaint ("Compl.") at 1, ¶¶ 147–199.

[5]       *See id.* ¶¶ 147–152 (first and second causes of action).  Pinter also alleges entrapment, *see id.*, but as the Second Circuit noted, "'[w]hile entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation.'"  *Pinter II*, 448 Fed. App'x at 105 n.5 (quoting *DiBlasio v. City of New York*, 102 F.3d 654, 656–57 (2d Cir. 1996) (quotation marks omitted)).

[6]       *See* Compl. ¶¶ 153–158 (third and fourth causes of action); Plaintiff's Memorandum in Response and Opposition to the Collective City Defendant Parties' Motion for Judgment on Some of the Plaintiff's Claims and in Support of the Plaintiff's Multiple Claims ("Pl. Opp.") at 1–2.

[7]       *See* Compl. ¶¶ 159–164 (fifth and sixth causes of action).

Fourteenth Amendment;[8] (v) unreasonable detention and excessive force based on Pinter's prolonged handcuffing in violation of state law and the Fourth and Fourteenth Amendments;[9] and (vi) denial of Pinter's right to associate with the Blue Door in violation of state law and the First and Fourteenth Amendments.[10] Pinter brings all of these claims against the City, but does not specify which claims are brought against which individual defendants.[11]

---

[8]      See id. ¶¶ 165–171 (seventh and eighth causes of action).

[9]      See id. ¶¶ 172–177 (ninth and tenth causes of action); Pl. Opp. at 1–2.

[10]      See Compl. ¶¶ 178–183 (eleventh and twelfth causes of action).

[11]      The caption of the Second Amended Complaint names the following defendants:  THE CITY OF NEW YORK, a municipal entity; NEW YORK CITY UNDERCOVER POLICE OFFICER # 31107; NEW YORK CITY POLICE OFFICERS "JOHN DOES," individually and in their official capacities; NEW YORK CITY POLICE COMMISSIONER RAYMOND KELLY, individually and in his official capacity, NEW YORK CITY MAYOR MICHAEL BLOOMBERG, individually and in his official capacity; JAMES TULLER, the then Commanding Officer of Patrol Borough Manhattan South on October 10, 2008, individually and in his official capacity; CAPTAIN "JOE" BRAILLE, Commander of the Vice Squad of Patrol Borough Manhattan South, individually and in his official capacity; CHIEF ANTHONY IZZO, Commander of the Organized Crime Bureau of the New York City Police Department, individually and in his official capacity; CHIEF JOSEPH ESPOSITO, individually and in his official capacity; BRIAN CONROY, individually and in his official capacity as Deputy Chief of the New York City Police Department's Vice Enforcement Division; SHARI C. HYMAN, individually and in her official capacity as Director of the New York City Mayor's Office of Special Enforcement; DETECTIVE JESSICA STERLING, Shield # 6132, individually and in her official capacity; SERGEANT MICHAEL MADISON, Shield # 4321, individually and in his official capacity; DETECTIVE MICHAEL MICHILENA, Shield # 1409, individually and in his official capacity;

All of the claims of federal constitutional violations are brought pursuant to Section 1983 of Title 42 of the United States Code ("Section 1983"), which creates "'a species of tort liability'" for, among other things, certain violations of constitutional rights.[12]  Pinter alleges that the City is liable under Section 1983 for the alleged constitutional violations because they resulted from the City's policies and customs, as required by *Monell*.[13]  Pinter also alleges that the City is vicariously liable for the alleged state law violations under *respondeat superior*, and directly liable based on the City's negligence.[14]

---

DETECTIVE SANDRA DAILEY, Shield # 1069, individually and in her official capacity; and NEW YORK CITY UNDERCOVER POLICE OFFICER # 3044, individually and in his official capacity.  *See id.* at 1.

[12]     *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986)).  *See, e.g.*, Compl. ¶ 148.

[13]     *See* Compl. ¶¶ 184–186 (thirteenth cause of action); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (establishing the standards under 42 U.S.C. § 1983 for municipal liability for constitutional torts by employees).

[14]     *See* Compl. ¶¶ 187–199 (fourteenth through sixteenth causes of action).  *See also* Pl. Opp. at 1–2 (listing claims).  Pinter argues in opposition to the City's motion for summary judgment that UC 31107's alleged fabrication of evidence violated Pinter's rights under the Fourteenth Amendment.  *See id.* at 5–6; Plaintiff's Memorandum Respecting the Plaintiff's Municipal Liability Claims ("Pl. Mem.") at 1 n.1.  Because this newly raised fabrication-based due process claim does not appear in the Second Amended Complaint, it has not been properly pleaded, and need not be considered.  *See* Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . .").

Shortly before the filing of the Second Amended Complaint, this Court denied, in part, defendants' motion for summary judgment on the issue of qualified immunity based on the allegations in the First Amended Complaint and Pinter's deposition.[15]  This Court held that the officers lacked probable cause to arrest Pinter for prostitution for the same reasons that DANY chose not to oppose Pinter's motion to vacate, and for other reasons explained at length in *Pinter I*.

On November 18, 2011, the Second Circuit reversed, holding that the individual defendants were entitled to qualified immunity from Pinter's false arrest and malicious prosecution claims.  The Second Circuit concluded that "the officers had arguable probable cause to arrest Pinter" for prostitution.[16]  Thus, "defendants acted reasonably — that is, not incompetently or in knowing violation of the law . . . — in arresting Pinter for a violation of New York Penal Law § 230.00."[17]

The Second Circuit also held that "Pinter's *Monell* claims are derivative of his claims against the individual defendants, and therefore any claims dismissed as against the individual defendants must also be dismissed as against

---

[15]     *Pinter I*, 710 F. Supp. 2d at 412 n.11, 425.

[16]     *Pinter II*, 448 Fed. App'x at 100 n.1, 105 n.6.

[17]     *Id.* at 105.

the City."[18]  Accordingly, the Second Circuit ordered that this Court "shall not

permit the plaintiff to pursue *Monell* claims derived from either the false arrest or

malicious prosecution claims."[19]  As discussed below, the Second Circuit's

reasoning in *Pinter II* appears to conflict with the holding in its more recent

published opinion in *Askins v. Doe No. 1*.[20]

Defendants now move for summary judgment on Pinter's remaining

claims.[21]  For the reasons stated below, defendants' motion is granted in part and

denied in part.

Pinter has also filed a motion, requesting that the Court "find that, as a

matter of fact and law, the Defendant City of New York is the 'real party in

interest' in this litigation" and is vicariously liable under *respondeat superior* for

---

[18]     *Id.* at 106 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799
(1986) ("[I]f [the police officer] inflicted no constitutional injury on respondent, it
is inconceivable that [the city] could be liable to respondent."); *Escalera v. Lunn*,
361 F.3d 737, 748–49 (2d Cir. 2004)).

[19]     *Id.*

[20]     No. 12 Civ. 0877, __ F.3d __, 2013 WL 4488698 (2d Cir. Aug. 23,
2013).

[21]     *See* Defendants' Memorandum of Law in Support of Defendants'
Motion for Summary Judgment Pursuant to Rule 56 ("Def. Mem."); Defendants'
Memorandum of Law in Reply and in Further Support for Defendants' Motion for
Summary Judgment ("Def. Reply").

injuries caused by its employees.[22]  Although Pinter's argument is not always easy to discern, it appears that Pinter is requesting that this Court disregard *Monell* and encourage the Second Circuit and the Supreme Court to overturn it.[23]  Because *Monell* remains good law and this Court is bound by Second Circuit and Supreme Court precedent, Pinter's motion is denied.

## II.   LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable

---

[22]     Pl. Mem. at 1.

[23]     *See, e.g.*, *id.* at 17–18.  Pinter correctly notes that questions have been raised about the accuracy of *Monell*'s analysis of Section 1983.  *See, e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011) (Posner, J.) (noting that "scholars agree" *Monell* is based on "historical misreadings"); *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 431–37 (1997) (Breyer, J., dissenting, joined by Stevens and Ginsburg, JJ.) (criticizing the "original reasoning" of *Monell* and questioning "the continued viability of *Monell*'s distinction between vicarious municipal liability and municipal liability based upon policy and custom"); *id.* at 430 (Souter, J., dissenting, joined by Breyer and Stevens, JJ.) (questioning whether there may be "sufficient reason to unsettle the precedent of *Monell*"); *Oklahoma City v. Tuttle*, 471 U.S. 808, 834–44 (1985) (Stevens, J., dissenting) (criticizing *Monell*'s historical analysis and calling for the elimination "from this class of civil-rights litigation the time consuming 'policy' issues that *Monell* gratuitously engrafted onto [Section 1983]").  If it were within the province of a federal district court to question Supreme Court precedent based on indications of dissension, I might be inclined to do so in this case.  But this Court's task is to apply Supreme Court and Second Circuit law as it stands.  As a result, I am constrained to apply *Monell* and its progeny, although I add my voice to the chorus of those who would encourage the Supreme Court to revisit *Monell*'s analysis.

inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[24]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[25]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law."[26]  "When the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[27]  The burden then "shifts to the non[-]moving party to present specific evidence showing a genuine dispute."[28]  This requires "'more than simply show[ing] that there is

---

[24]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 692 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)) (other quotations omitted).

[25]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[26]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[27]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[28]     *Id.*

some metaphysical doubt as to the material facts,'"[29] and the non-moving party

cannot "rely on conclusory allegations or unsubstantiated speculation."[30]

In deciding a motion for summary judgment, "[t]he role of the court is

not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried."[31]  "'Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge.'"[32]

## III.   DISCUSSION

### A.   False Arrest and Malicious Prosecution Claims

#### 1.   *Pinter II* and *Askins*

The Second Circuit held in *Pinter II* that the individual defendants are

entitled to qualified immunity from Pinter's false arrest and malicious prosecution

claims because even according to Pinter's allegations, "the officers had *arguable*

---

[29]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[30]     *Id.*

[31]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[32]     *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

probable cause to arrest Pinter" for prostitution.[33]   The Second Circuit left open the

question, however, of whether the individual defendants had *actual* probable

cause.[34]   "Probable cause exists when, based on the totality of circumstances, the

officer has 'knowledge of, or reasonably trustworthy information as to, facts and

circumstances that are sufficient to warrant a person of reasonable caution in the

belief that an offense has been or is being committed by the person to be

arrested.'"[35]

Under New York Penal Law § 230.00, "[a] person is guilty of

prostitution when such person engages or agrees or offers to engage in sexual

conduct with another person in return for a fee."   In *People v. A.S.*, a state trial

court stated that "acts of agreement showing defendant's intent to consummate an

---

[33]     *Pinter II*, 448 Fed. App'x at 100 n.1, 105 n.6 (emphasis added).

[34]     *See id.* at 105 n.6 (noting "our finding that the officers had arguable probable cause to arrest Pinter").   I emphasize that the Second Circuit's comment that "defendants acted reasonably," *id.* at 105, does not decide the question of whether Pinter's arrest was constitutionally reasonable under the Fourth Amendment in the sense of being supported by probable cause.   If it did, there would be no distinction between arguable and actual probable cause.   *See also Walczyk v. Rio*, 496 F.3d 139, 168 (2d Cir. 2007) (Sotomayor, J., concurring) (criticizing the arguable probable cause inquiry as an "imprecise" bifurcation of qualified immunity analysis, whose result is to give litigants a "second bite at the immunity apple.").

[35]     *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)).

act of prostitution" include "taking a step toward committing the act" such as "accepting the consideration or accompanying the undercover officer to a place where the sexual act might occur."[36]  In another case, *People v. A.M.*, a state trial court confronted a set of facts with obvious similarities to the present case.[37]  A thirty-five year old gay man with no criminal record, who had apparently never been arrested before, was charged with prostitution after he allegedly agreed to engage in a sex act for a fee with a male undercover police officer.[38]  In dismissing the information as facially insufficient, the court noted:

> Christopher Street and the Westside Highway, where this incident is alleged to have occurred, has long been known as a place where gay men are able to meet and socialize.  The danger exists that an encounter in which an individual is simply making contact with another, perhaps for the purposes of consensual sex, may, due to the ambiguities attendant to such encounters, be misconstrued or misunderstood by a police officer to be a prostitution offense.[39]

The court also noted that "[w]ords or acts of the defendant which provide a reliable basis to believe that the defendant actually entered into and accepted the terms of [an agreement to exchange sex for a fee]" include "whether the defendant said

---

[36]     685 N.Y.S.2d 573, 574 (Crim. Ct. N.Y. Co. 1998).

[37]     No. 2001CN 001284, 2001 WL 1117455 (Crim. Ct. N.Y. Co. July 31, 2001).

[38]     *See id.* at *1.

[39]     *Id.* at *4.

something indicating he would exchange sex for remuneration, whether he discussed fees, whether he suggested a location for the act, whether he nodded his head or made some other affirmative gesture, or whether he accepted money."[40]

A reasonable jury could accept Pinter's version of events as described in his deposition, which has already been summarized at length in *Pinter I*. In brief: On October 10, 2008, Pinter, a 52-year-old white gay male with no prior history of prostitution-related offenses, stopped at the Blue Door. The separate adult section in the store primarily sells gay pornography videos and sex toys. There are other areas of the store in which gay men sometimes engage in sexual activity, alone or with each other.[41]

While Pinter was browsing the adult videos, a thirty year old Asian

---

[40]     *Id.* (citing *Matter of Marco M.*, 551 N.Y.S.2d 204 (1st Dep't 1990)). In a later case, the trial court noted that in *People v. A.M.*, dismissal was justified because "neither the complaint nor the VDF contains any statements whatsoever allegedly made by Defendant. Here, [by contrast], the VDF indicates that Defendant allegedly stated, 'Yes it's $175 for me to give you head, and you have to wear a condom.'" *People v. Rodas*, 910 N.Y.S.2d 407, 407 n.2 (Crim. Ct. N.Y. Co. 2010).

[41]     *See, e.g.*, Deposition of Plaintiff Robert Pinter ("Pinter Dep.") at 91–94. Excerpts from Pinter's deposition appear at Ex. 16 to 7/16/13 Declaration of James Meyerson, Counsel for Plaintiff, in Response and Opposition to the Collective Defendant Parties' Motion and in Support of the Plaintiff's Remaining Multiple Claims ("Meyerson Decl."); Ex. A to 6/20/13 Declaration of Dara Olds, Counsel for Defendants, in Support of Motion for Summary Judgment ("Olds Decl."); Exs. A1–A9 to 1/26/10 Declaration of James I. Meyerson in Opposition to Defendants' First Motion for Summary Judgment.

male undercover officer, UC 31107,[42] made eye contact with him and they smiled at each other.  UC 31107 approached Pinter and began flirting with him and complimenting his looks.  UC 31107 asked, "[W]hat do you like to do?"  Because they were standing in the adult video section of a store apparently known as a destination for gay sex, Pinter reasonably interpreted UC 31107 to be asking not about Pinter's favorite hobbies, but about the kinds of sexual activities that Pinter enjoyed.  Pinter said that he enjoyed — and was good at — oral sex.  UC 31107 replied that he enjoyed oral sex as well, but was nervous about engaging in any such activity in the video store.

UC 31107 then informed Pinter that his car was parked nearby — with the implication that the car might be a suitable location for the two to engage in oral sex.  Pinter led the way to the exit, with UC 31107 following right behind.  At this point there had been no mention whatsoever of an exchange of money for sex (i.e. prostitution).

At the door but before leaving the store, UC 31107 said to Pinter: "I want to pay you $50 to suck your dick."  Caught off guard by the unprompted offer of money, Pinter said nothing.  As the strangeness of the situation sunk in, Pinter decided that there was no possibility of "engaging in anything" with UC 31107.

---

[42]    *See* Report and Analysis Prepared for Vice Division Chief Defendant Brian Conroy ("Conroy Report"), Ex. 14 to Meyerson Decl., at 2–3.

Because Pinter's apartment was in the same direction as UC 31107's car, however, Pinter and UC 31107 continued to walk in the same direction. The two engaged in playful sexual banter. UC 31107 never tried to confirm that Pinter had agreed to accept the money, which UC 31107 could have easily done. After about a hundred feet, Pinter was arrested for prostitution.[43]

Drawing all reasonable inferences in favor of Pinter, a jury could find that Pinter's arrest was not based on probable cause. This is not to question the Second Circuit's conclusion that "UC 31107 could have reasonably believed that Pinter had agreed to be compensated in exchange for allowing UC 31107 to act on his desire to perform oral sex on Pinter."[44] Rather, the facts of this case, viewed in the light most favorable to Pinter, illustrate the distinction between arguable probable cause and actual probable cause.

On the one hand, applying the standard for qualified immunity as settled by the Second Circuit's Summary Order, it would be inaccurate to say that UC 31107 was "'plainly incompetent'" or must have "'knowingly violate[d] the law'" in concluding that Pinter had agreed to engage in prostitution.[45] Because UC

---

[43]   *See* Pinter Dep. at 94–127.

[44]   *Pinter II*, 448 Fed. App'x at 104.

[45]   *See id.* at 103 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

31107 had arguable probable cause for an arrest, he is entitled to qualified immunity.  "[O]fficers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."[46]

On the other hand, declaring Pinter's arrest — according to his version of events — to be based on actual probable cause would dilute the Fourth Amendment's protection of individual liberty from unreasonable government intrusion.  An officer does not have probable cause to believe a person is a prostitute simply because the person remained silent after being inexplicably offered a fee for what he expected to be consensual, gratuitous sex.[47]  To allow the police to arrest such a person for prostitution — moments later, and without so much as an attempt at confirmation — would invite abuses.

There are countless reasons why someone who is not a prostitute might fail to immediately, vocally reject an inexplicable offer of gratuitous money for a consensual sexual act.  Pinter's account of his arrest illustrates some of the

---

[46]     *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  *Accord Askins*, 2013 WL 4488698, at *4 ("The doctrine that confers qualified immunity on individual state or municipal actors is designed to ensure that the persons carrying out governmental responsibilities will perform their duties boldly and energetically without having to worry that their actions, which they reasonably believed to be lawful at the time, will later subject them to liability on the basis of subsequently developed legal doctrine.").

[47]     Like the trial court in *People v. A.M.*, I use the phrase "consensual sex" as shorthand for "consensual sex not in return for a fee."

most obvious reasons:  wariness and confusion.  Given the oddity of UC 31107's

unprompted request, someone in Pinter's situation might well fail to perceive the

offer of money as a form of solicitation for prostitution, and might instead simply

wonder what UC 31107 was thinking:  does he have a practice of offering money

for consensual sex?  Does it give him some thrill?  Indeed, if the NYPD began

sending attractive young female officers into heterosexual dance clubs where they

flirted with older men, asked them what they liked to do sexually, invited them to

go nearby to have a sexual encounter — and on the way out, asked whether they

would accept $50 to have oral sex performed on them — no doubt a good number

of straight men would be too bewildered by this surreal turn of events to recognize

that, legally speaking, they were being asked to prostitute themselves.  Pinter has

provided sufficient evidence for a reasonable jury to find that the NYPD's

undercover officers – who offered fees for sex – succeeded in obtaining agreement,

or at least silence, not only from Pinter but from a number of gay men who are not

prostitutes.[48]

       When a method of identifying prostitutes predictably results in the

frequent arrest of non-prostitutes, and this repeated violation of liberty could be

---

[48]     *See, e.g.*, Conroy Report.  I also note that a person who — unlike
Pinter — still wished to proceed with the consensual sexual act, even after being
offered an unnecessary fee, might decide to remain silent, carry out the act, and
then refuse the fee after the completion of the act.

avoided through a minimal application of caution, such as by asking a simple follow-up question,[49] then the reasonableness of the method under the Fourth Amendment is doubtful. At the very least, the method should not be immunized from judicial scrutiny by holding that the resulting arrests are as a rule based on probable cause.

Because a reasonable jury could find that UC 31107 lacked probable cause for Pinter's arrest, Pinter could establish at trial that he was subject to a violation of his constitutional right to be free from unreasonable seizure under the Fourth Amendment. This conclusion leads to a dilemma. The Second Circuit held in its Summary Order that "Pinter's *Monell* claims are derivative of his claims against the individual defendants, and therefore any claims dismissed as against the individual defendants must also be dismissed as against the City."[50] Accordingly,

---

[49]     *See Pinter II*, 448 Fed. App'x at 105 (noting that "UC 31107 could have been more explicit in ascertaining whether Pinter was truly relying on financial remuneration in return for allowing the undercover officer to perform oral sex on him"); *Pinter I*, 710 F. Supp. 2d at 429-430 ("An officer of reasonable caution in these circumstances would have asked a follow-up question when faced with Pinter's silence about whether he meant to accept the money [given that] probable cause did not yet exist for Pinter's arrest. . .") (quotations omitted).

[50]     *Pinter II*, 448 Fed. App'x at 106 (citing *Heller*, 475 U.S. at 799 ("[I]f [the police officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."); *Escalera*, 361 F.3d at 748–49). *Escalera*, however, does not hold that a *Monell* claim based on an alleged constitutional tort must be dismissed if the officer who carried out the alleged tort is entitled to qualified immunity. *See Escalera*, 361 F.3d at 748–49

the Second Circuit ordered that this Court "shall not permit the plaintiff to pursue *Monell* claims derived from either the false arrest or malicious prosecution claims."[51]

In a subsequent, published opinion, *Askins v. Doe No. 1*, however, the Second Circuit held that "the entitlement of . . . individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is . . . irrelevant to the liability of the municipality."[52]  "Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights."[53]  "To rule, as the district court did, that the City of New York escapes liability for the tortious conduct of its police officers

---

(granting qualified immunity to the commissioner of a corrections department based on finding an insufficient basis for inferring the existence of an unconstitutional departmental policy or practice of filing false charges against corrections officers).

[51]     *Pinter II*, 448 Fed. App'x at 106.

[52]     *Askins*, 2013 WL 4488698, at *4 ("'[M]unicipalities have no immunity from damages for liability flowing from their constitutional violations.'" *Id.* (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012))).

[53]     *Id.* (citing *Owen v. City of Independence*, 445 U.S. 622, 657 (1980)).

because the individual officers are entitled to qualified immunity would effectively

extend the defense of qualified immunity to municipalities, contravening the

Supreme Court's holding in *Owen*."[54]

      *Askins* conflicts with *Pinter II*. The latter holds that where a plaintiff

has suffered a constitutional tort at the hands of an officer who is entitled to

qualified immunity, the City is immune from a *Monell* claim based on the tort; the

former holds the opposite. Indeed, the Second Circuit's criticisms of the district

court's holding in *Askins* appear to apply with equal force to *Pinter II*:

> In dismissing Askins's claim against the City, the district court relied on the proposition "that the City cannot be liable under *Monell* where Plaintiff cannot establish a violation of his constitutional rights." The court explained: "All of the alleged constitutional violations in this case are either time-barred or barred by the doctrine of qualified immunity. Therefore, it cannot be said that any allegedly illegal City policy caused Plaintiff a constitutional remediable injury, and no *Monell* claim lies against the City." This conclusion reflects a misunderstanding of the relationship between the liability of individual actors and municipal liability for purposes of *Monell*. The court was entirely correct in stating that the City "cannot be liable under *Monell* where Plaintiff cannot establish a violation of his constitutional rights." . . . .
>
>       It does not follow, however, that the plaintiff must obtain a *judgment* against the individual tortfeasors in order to establish the liability of the municipality. It suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality. In fact, the plaintiff need not sue the

---

[54]    *Id.*

individual tortfeasors at all, but may proceed solely against the municipality.[55]

Defendants attempt to reconcile the holdings of *Askins* and *Pinter II* by arguing that *Pinter II* held not only that the arresting officers had arguable probable cause, but that they had actual probable cause, and thus that Pinter suffered no constitutional injury.[56]  Defendants' interpretation is not plausible.  If the Second Circuit had intended to make a holding that the arresting officers had probable cause — a holding with significant implications for the Fourth Amendment — it would have done so explicitly, rather than through a debatable inference.  In addition, the Second Circuit would have analyzed probable cause, not *arguable* probable cause, and would not have used the redundant qualifier "arguable" when characterizing its holding.[57]

---

[55]     *Id.* at *3–4 (citations omitted).

[56]     *See* 9/4/13 Letter from Dara Olds to the Court, at 1–2 (arguing that the Second Circuit dismissed Pinter's false arrest and malicious prosecution claims based on finding "that plaintiff suffered no constitutional injury," and thus that "the Circuit's decision in *Pinter* is in harmony with, rather than at odds with, the *Askins* decision").  *See also* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp.") at 5 (arguing that the Second Circuit's "analysis of the facts appears to suggest very strongly that the Defendants had probable cause").

[57]     *See Pinter II*, 448 Fed. App'x at 105 n.6 (characterizing the opinion as "finding that the officers had *arguable* probable cause to arrest Pinter" (emphasis added)).

Because of the conflict between *Pinter II* and *Askins*, this Court cannot proceed without violating one of the two Second Circuit authorities.  Either this Court must disregard the law of the case as articulated in the *Pinter II*, as well as the explicit directions with which *Pinter II* concludes, or this Court must disregard *Askins*.  While this Court is extremely wary of failing to comply with an explicit directive of the Second Circuit, it is equally wary of failing to adhere to a subsequent and more authoritative statement of Second Circuit law.  *Askins* is a published opinion that extensively analyzed this issue, while the unpublished decision in *Pinter II* has no precedential effect beyond this immediate case.[58]  Because *Askins* provides a thorough, binding, directly on-point analysis that conflicts with the unpublished decision in *Pinter II*, I follow *Askins* and conclude that the Second Circuit's grant of qualified immunity to the individual defendants does not bar Pinter from bringing *Monell* claims against the City that derive from his arrest having lacked probable cause.[59]  In particular, the Second Circuit's

---

[58]    *See* Second Circuit Local Rule 32.1.1(a).

[59]    To the extent that this approach lies in tension with the law of the case doctrine, I note that this doctrine is not absolute.  "Under the law of the case doctrine, a decision on an issue made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).  While courts should "not depart from the law of the case absent cogent or compelling reasons," *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996), one such reason may be "an intervening change of controlling law."  *Virgin Atl. Airways, Ltd. v. National*

qualified immunity finding does not by itself bar Pinter's false arrest and malicious prosecution claims against the City.

## 2.   *Monell* **Liability Based on False Arrest**

"[D]eliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs[.]'"[60]  A reasonable jury could find based on the record evidence that the City had a custom of carrying out arrests like Pinter's, and that the City was deliberately indifferent to the obvious risk of arresting gay men for prostitution without probable cause.  As noted above, DANY agreed to the dismissal of Pinter's case in part because "'the People recently dismissed three pending cases with circumstances similar to those of the case at bar.'"[61]  Pinter offers evidence that could support a finding that the NYPD engaged in a pattern of arresting gay

---

*Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).  *Accord In re Nassau Cnty. Strip Search Cases*, No. 99 Civ. 2844, 2013 WL 3805659, at *3 (E.D.N.Y. July 18, 2013).

[60]    *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012)  (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

[61]    Gregory LeDonne, Assistant District Attorney, Affirmation and Response to Defendant's Motion to Vacate Conviction, Ex. 11 to Meyerson Decl., ¶ 5.

23

men without probable cause for prostitution at video stores, and especially at the Blue Door.[62]

Pinter also cites numerous excerpts from depositions and other evidence tending to show that the NYPD failed to train undercover officers to avoid arresting gay men for prostitution without probable cause based on a misunderstanding of the circumstances.[63] For example, the Chief of the NYPD's Organized Crime Control Bureau told the NYPD's Internal Affairs Bureau ("IAB") that he was unaware of prostitution arrests being made at video stores targeted for nuisance abatement,[64] but that once he learned of these arrests, he "didn't think the arrests were proper," although he believed they were legal. He stated that "if he

---

[62]    *See, e.g.*, Conroy Report at 4 (listing the prostitution arrests at the Blue Door of several men in their forties and fifties with no prior criminal record, all resolved by the defendants pleading guilty to the non-criminal violation of disorderly conduct).

[63]    *See generally* Pl. 56.1 ¶¶ 45–59.

[64]    Pinter has argued that his arrest was caused by the City's desire to commence civil nuisance abatement actions against video stores and other businesses frequented by members of the lesbian, gay, bisexual, and transgender communities. According to Pinter, he was arrested because the City needed to obtain prostitution arrests at the Blue Door in order to begin its nuisance abatement litigation, and the City was not concerned about whether the arrests resulted in convictions. *See Pinter I*, 710 F. Supp. 2d at 411, 418; Pl. 56.1 at 1–2 & nn. 2, 6; Pl. 56.1 ¶¶ 63–74. "Nuisance abatement proceedings address continuous public health, criminal, or unlawful conditions at a premises, not the isolated criminal activities of any individual." *Pinter I*, 710 F. Supp. at 416.

would have known about the arrests and the policy he would never have allowed it to happen."[65]

Similarly, a sergeant formerly assigned to Manhattan South Vice told investigators at IAB that practices he believed to be proper when he was assigned there, he now believed "could possibly be construed as entrapment."[66]  He stated that "it was not standard operating procedure for undercovers to ask for sex for money,"[67] and that "he could have benefitted from additional[] training . . . , but the topic of additional training was never addressed."[68]  Indeed, the sergeant's "knowledge of vice enforcement was gained through hands on experience and not Department training."[69]  He never instructed his officers regarding "the verbal threshold they could not cross during an operation that would constitute entrapment," and "to his knowledge, no member of MS Vice ever conferred with the Legal Bureau."[70]

---

[65]    Internal Affairs Bureau, Group 41, Investigating Officer's Report ("IAB Report"), Ex. 12 to Meyerson Decl., at 18.

[66]    *Id.* at 9.

[67]    *Id.* at 8.

[68]    *Id.* at 9.

[69]    *Id.*

[70]    *Id.* at 8.

Likewise, a representative of the NYPD Legal Bureau told IAB that "[t]here are no Department standards regarding entrapment. The Department prefers to avoid entrapment but it is not a set policy."[71]  Although entrapment itself does not give rise to civil liability, a reasonable jury could find that there is an obvious risk that officers who are not trained to avoid entrapment in the context of prostitution arrests like Pinter's will also carry out arrests without probable cause, as a reasonable jury could find UC 31107 did at least in Pinter's case, and perhaps also in cases of other men at the Blue Door.  A reasonable jury could find that the NYPD failed to make meaningful efforts to address these obvious risks.

### 3.    *Monell* Liability Based on Malicious Prosecution

"Section 1983 liability may . . . be anchored in a claim for malicious prosecution, as this tort 'typically implicates constitutional rights secured by the fourteenth amendment, such as deprivation of liberty.'"[72]

> Though section 1983 provides the federal claim, we borrow the elements of the underlying malicious prosecution tort from state law.  In New York, a plaintiff alleging malicious prosecution must show: (1) the defendant commenced a criminal proceeding against him; (2) the proceeding ended in the plaintiff's favor; (3) the defendant did not have probable cause to believe the plaintiff was guilty of the crime charged; and (4) the defendant acted with

---

[71]    *Id.* at 16.

[72]    *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994) (quoting *Easton v. Sundram*, 947 F.2d 1011, 1017 (2d Cir. 1991)).

actual malice.[73]

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'"[74]  Nevertheless, no reasonable jury could find based on the record evidence that UC 31107 or the other officers who participated in Pinter's arrest did so with actual malice.  Rather than offering direct evidence of an improper motive, Pinter argues that malice may be inferred from the absence of probable cause.[75]  He cites *Lowth*, which states that "the lack of probable cause — while not dispositive — tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause."[76]  In this case, however, the inferential leap from a lack of probable cause to a lack of belief in the guilt of the accused, much less to malice, would be improper.  There is no evidence that UC 31107 or the other officers did not believe Pinter was guilty of prostitution.  The Second Circuit's holding that UC 31107 had *at the very least*

---

[73]     *Id.* (citiations omitted).

[74]     *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978)).

[75]     *See* Pl. Opp. at 20 n.26.

[76]     *Lowth*, 82 F.3d at 573.

arguable probable cause and behaved objectively reasonably further undermines the inference that a lack of probable cause can support a finding of malice.

Pinter's malicious prosecution claim against the City, on the other hand, raises genuine issues of material fact.  A reasonable jury could find that the City was deliberately indifferent to the obvious risk of false arrests like Pinter's, as discussed above.  A reasonable jury could also find that the City abused the criminal process for illegitimate ends by carrying out prostitution arrests not in order to obtain convictions but in order to improve its position in nuisance abatement negotiations, as discussed below.  This scenario provides sufficient support for the conclusion that Pinter's arrest resulted from a municipal custom of commencing criminal proceedings such as his not with a desire to see the ends of justice served, but based on the improper motive of seeking leverage in nuisance abatement negotiations.  This conclusion would be sufficient to establish "actual malice" in the limited sense required for a malicious prosecution claim.[77]

---

[77]     *See Engel v. CBS, Inc.*, 93 N.Y. 2d 195, 204 (1999) (stating that the actual malice requirement is satisfied by a showing that the action was motivated by "a purpose other than the adjudication of a claim"); *Putnam v. County of Steuben*, 876 N.Y.S.2d 819, 821 (4th Dep't 2009) ("In establishing the element of actual malice, a plaintiff need not demonstrate the defendant's intent to do him or her personal harm, but need only show a reckless or grossly negligent disregard for his or her rights." (quotation omitted)).  Of course, if the jury were to find that Pinter's arrest was based on probable cause, then Pinter's malicious prosecution claim would fail.

**B.    Excessive Force**

The Second Amended Complaint alleges that Pinter's handcuffing constituted excessive force, and his detention in the police van was unreasonably long, both in violation of New York law and the Fourth and Fourteenth Amendments.[78]  The crux of Pinter's claim, and the focus of the parties' submissions, is that his detention in numbingly tight rear handcuffs for three to four hours in a moving police van was unreasonable and thus violated his rights under the Fourth Amendment, and that Pinter's prolonged handcuffing was pursuant to a custom or policy of the City.[79]

> The Second Circuit
>
> analyzes claims of excessive force arising in the context of an arrest under the Fourth Amendment's objective reasonableness test, paying "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[80]
>
> "Frequently, a reasonable arrest involves handcuffing the suspect, and

---

[78]    *See* Pl. Opp. at 1–2; Compl. ¶¶ 173, 176.

[79]    *See* Pl. Opp. at 1–4; Pl. 56.1 ¶¶ 1–19.

[80]    *Phelan v. Sullivan*, No. 12 Civ. 3604, 2013 WL 5183664, at *2 (2d Cir. Sept. 17, 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (reversing district court's grant of summary judgment on excessive force claim).

to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out."[81]  In addition, "'[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.'"[82]

Nevertheless, "liability may exist where an officer 'gratuitously inflict[s] pain in a manner that [is] not a reasonable response to the circumstances.'"[83]  The Second Circuit has specifically held that a reasonable jury could find the following conduct objectively unreasonable under the Fourth Amendment:  pushing an arrestee to the floor and causing him to remain there in a

---

[81]     *Grant v. City of New York*, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007).

[82]     *Lozada v. City of New York*, No. 12 Civ. 0038, 2013 WL 3934998, at *5 (E.D.N.Y. July 29, 2013) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y.2008) (collecting cases)).  The Second Circuit has also noted that "there is a general consensus among courts [that] have addressed the issue that otherwise reasonable force used in handcuffing a suspect may be unreasonable when used against a suspect whom the officer knows to be injured," although "these cases involving handcuffing uniformly concern suspects who either have visible injuries or are cooperating in their arrests." *Beckles v. City of New York*, 492 Fed. App'x 181, 182 (2d Cir. 2012).

[83]     *Phelan*, 2013 WL 5183664, at *2 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004)).  The Second Circuit has "concluded that summary judgment [on an excessive force claim] was not appropriate . . . where the plaintiff alleged that a defendant 'pushed' her against a car door, 'yanked' her out, 'threw [her] up against the fender,' and 'twisted [her] arm behind [her] back,' and that she had suffered bruises lasting several weeks," even though plaintiff did not seek medical treatment for her injuries."  *Id.* (quoting *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987)).

painful posture with "unduly tight" handcuffs "for five or six hours."[84]

A reasonable jury could find that Pinter experienced pain in his wrists and numbness in his hands for roughly four hours as a result of the tightness of his handcuffs, and that the handcuffing resulted in injuries that exceeded temporary discomfort.  Pinter later obtained medical treatment for continuing pain in his shoulders, arms, wrists, hands, and thumbs caused by the handcuffing.[85]

Drawing all reasonable inferences in favor of Pinter, a jury could find that the officers behaved unreasonably under the Fourth Amendment in refusing to adjust Pinter's handcuffs after Pinter stated that the handcuffs were becoming progressively tighter and that his hands were becoming cold and numb, and requested that the handcuffs be loosened.  Initially, Pinter was the only arrestee in

---

[84]     *Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir. 1989). *Accord Beckles v. City of New York*, No. 08 Civ. 03687, 2011 WL 722770, at *5 (S.D.N.Y. Feb. 25, 2011), *aff'd*, 492 Fed. App'x 181 (2d Cir. 2012) (noting that "proof of an excessively long period of time between restraint and booking" could "make an otherwise reasonable handcuffing excessive").

[85]     *See* Pl. 56.1 ¶¶ 1–8; Treatment Documents from Dr. Elizabeth A. Greenberg, D.C., Ex. 7 to Meyerson Decl., at 2.  Pinter's deposition only mentions cold and numbness in his hands, but a subsequent submission to the Court mentions "pain and serious discomfort."  Pl. 56.1 ¶ 5.  In any case, a reasonable jury could infer that Pinter experienced pain in his wrists from Pinter's description of the tightening handcuffs and from the fact that he later sought treatment for pain in his hands and wrists.  *See id.* ¶¶ 5, 8 & n.8.

the van,[86] there was no evidence that he posed any threat or was uncooperative, and

the officers knew or should have known that it might be hours before the handcuffs

would be removed.  In addition, Pinter asked the officers to loosen the cuffs, but

they refused.  A reasonable jury could find that the officers' needless refusal to

adjust Pinter's handcuffs over a prolonged period amounted to the gratuitous

infliction of pain.[87]

      The officers in the van are not entitled to qualified immunity.[88]  There

is a clearly established constitutional right under the Fourth Amendment to be free

from the use of force "if it is excessive under objective standards of

reasonableness."[89]  A reasonable jury could find that the officers acted not only

---

[86]    The Supreme Court has held that the need to detain multiple individuals in an enclosed space "ma[kes] the use of handcuffs all the more reasonable."  *Muehler v. Mena*, 544 U.S. 93, 100 (2005).

[87]    *See Amnesty Am.*, 361 F.3d at 124 (holding that gratuitous infliction of pain is unreasonable under the Fourth Amendment).

[88]    I held in *Pinter I* that "defendants have waived any absolute or qualified immunity defense as to Pinter's excessive force and unreasonable detention claims."  *Pinter I*, 710 F. Supp. 2d at 434.  However, the Second Circuit directed that "[o]n remand, after such further discovery as may be appropriately conducted with regard to the remaining claims, the District Court will consider any further motions from the defendants claiming entitlement to qualified immunity or judgment on the merits of the abuse of process, discrimination, associational, excessive force, and unreasonable detention claims."  *Pinter II*, 448 Fed. App'x at 106.

[89]    *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

unreasonably, but were "'plainly incompetent'" or "'knowingly violate[d] the law'"[90] by gratuitously inflicting pain on Pinter over such an extended period of time when there is not a shred of evidence that Pinter posed an immediate threat to their safety, resisted arrest, or attempted to flee.[91]

Finally, the City is not entitled to summary judgment on Pinter's excessive force claim.  A reasonable jury could find that the officers in the van acted in accordance with an unconstitutional policy or custom of the City to leave arrestees in unduly tight handcuffs for hours at a time in police vans while other prisoners were collected, without training NYPD officers concerning the proper use of "double locked" handcuffs or how to respond to complaints regarding pain caused by handcuffs.[92]  For example, Manhattan South Vice Commanding Officer Steven Braille testified that Pinter was treated according to "standard operating procedure,"[93] that the NYPD has no policies or training concerning how to mitigate the effects of an extended handcuffing,[94] and that the NYPD has no policy other

---

[90]     *Pinter II*, 448 Fed. App'x at 103 (quoting *Malley*, 475 U.S. at 341).

[91]     *See Phelan*, 2013 WL 5183664, at *2.

[92]     *See* Pl. 56.1 ¶¶ 10–19.

[93]     Deposition of Manhattan South Vice Commanding Officer Steven Braille, Ex. 18 to Meyerson Decl., at 154.

[94]     *See id.* at 157.

than "common sense" regarding when to loosen cuffs in response to a complaint that they are too tight.[95]

### C.   Unlawful Stop

The Supreme Court has held that under the Fourth Amendment, it is constitutionally reasonable for the police to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[96] This form of investigative detention is now known as a *Terry* stop.[97] The test for determining whether a *Terry* stop is taking place "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[98]

A *Terry* stop requiring reasonable suspicion may become an arrest requiring probable cause "if the means of detention are 'more intrusive than

---

[95]     *Id.* at 158–159.

[96]     *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (some quotation marks omitted).

[97]     *See Davis v. City of New York*, 902 F. Supp. 2d 405, 411 (S.D.N.Y. 2012) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

[98]     *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

necessary.'"[99]

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."[100]

"A critical factor in evaluating the intrusiveness of a stop is the length of the detention."[101]  A lengthy detention, however, is not a necessary condition of an arrest.  An investigatory stop may ripen into a *de facto* arrest if it "continues too long *or* becomes unreasonably intrusive."[102]  Accordingly, although a *Terry* stop may ripen into an arrest, not every arrest arises from a *Terry* stop.

Pinter argues that prior to his arrest, UC 31107 stopped him "without reasonable suspicion that the Plaintiff was engaged in any unlawful conduct."[103]  In

---

[99]     *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).

[100]     *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).  *Accord United States v. Wiggan*, No. 12-2393 CR, 2013 WL 3766535, at *3 (2d Cir. Jul. 19, 2013).

[101]     *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992).

[102]     *Id.*

[103]     Pl. Opp. at 9.

order to evaluate this argument, it is necessary to determine when Pinter was stopped, if at all, prior to his arrest.  According to Pinter's version of events, he consented to leave the Blue Door with UC 31107, not knowing that UC 31107 was an undercover officer.  UC 31107 offered to pay him $50 to perform oral sex on him.  Confused and suspicious, Pinter silently decided that nothing would happen between him and UC 31107, but Pinter continued to walk and talk with UC 31107 because UC 31107's car was in the same direction as Pinter's apartment.  Pinter has explicitly conceded that as they walked, he felt free to walk away from UC 31107.[104]  After they had walked for about a minute, two plainclothes officers rushed toward Pinter, pushed him into a fence and searched his pockets.  When Pinter saw that one of the men had a badge, he "assumed they were putting me under arrest."[105]  Then the officers placed Pinter in handcuffs and escorted him to their van.[106]

No reasonable jury could find that an investigative stop took place in the moments before Pinter was handcuffed and escorted to the police van.  When the two officers rushed toward Pinter, pushed him against a fence, and searched his

---

[104]    *See* Pinter Dep. at 115.

[105]    *Id.* at 122.

[106]    *See generally id.* at 99–124.

pockets — without any self-protective justification for this use of force, and without any indication that the encounter was investigatory[107] — the intrusiveness of their actions went beyond what was necessary for an investigatory stop. Because Pinter's detention, viewed as a *Terry* stop, would have been unreasonably intrusive from the start, it was not a *Terry* stop at all.  It was a sudden arrest — as Pinter reasonably perceived from the moment he saw that one of the men seizing him had a badge.

Moreover, even if the opening moments of Pinter's arrest could be categorized — for the sake of argument — as a *Terry* stop, the Second Circuit's ruling that UC 31107 had arguable probable cause to arrest Pinter for prostitution forecloses the possibility that the arresting officers might have lacked reasonable suspicion for a stop.  Neither the Supreme Court nor the Second Circuit has attempted to quantify the precise probability of criminal conduct that is necessary to justify a *Terry* stop, but it is clear that "arguable probable cause" is at least as strong as "reasonable suspicion" with respect to probable criminality.  An officer

---

[107]     "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest."  *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Terry*, 392 U.S. at 24). Neither side has argued that the arresting officers' use of force would have been necessary as self-protective measures in an investigatory stop of Pinter.

who has arguable probable cause for an arrest also, by definition, has a sufficient evidentiary basis to justify a *Terry* stop.

In sum, drawing all reasonable inferences in Pinter's favor, Pinter was free to leave until the moment he was arrested, and at the moment he was arrested, the arresting officers had sufficient evidence to justify an investigative stop. Defendants are entitled to summary judgment on Pinter's claimed Fourth Amendment violation based on a pre-arrest stop.

## D.    Right to Expressive Association

"The United States Constitution affords protection to two distinct types of association, 'intimate association' and 'expressive association.'"[108]  The right to intimate association, which is implied by the Bill of Rights' protection of the "fundamental element[s] of personal liberty," entails that the choice to enter into and maintain certain intimate, identity-defining human relationships — such as marriage, parenthood, and cohabitation with family — "must be secured against undue intrusion by the State."[109]  The right to expressive association arises under the First Amendment, because "'implicit in the right to engage in activities

---

[108]    *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995–96 (2d Cir. 1997) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984); *City of Dallas v. Stanglin*, 490 U.S. 19, 23–25 (1989)).

[109]    *Roberts*, 468 U.S. at 617–20.

38

protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'"[110]  "The First Amendment's protection of expressive association is not reserved for advocacy groups.  But to come within its ambit, a group must engage in some form of expression, whether it be public or private."[111]  The Second Circuit has made clear that "[t]he Constitution does not recognize a generalized right of social association.  The right [of association] generally will not apply, for example, to business relationships, chance encounters in dance halls, or paid rendezvous with escorts."[112]

The Second Amended Complaint alleges the violation of Pinter's "right 'to associate' with the business entities where he desires to do business" under the First and Fourteenth Amendments and "the laws and Constitution of the State of New York."[113]  In light of the arguments in Pinter's opposition to summary judgment, however, Pinter's right of association claim is more simply stated as a Section 1983 claim against all defendants, including the City under *Monell*, based

---

[110]     *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts*, 468 U.S. at 622).

[111]     *Id.* at 648.

[112]     *Sanitation*, 107 F.3d at 996 (citations omitted).

[113]     Compl. ¶¶ 178–183.

on a violation of Pinter's First Amendment right to expressive association with the Blue Door.[114]

The relationship between the Blue Door and its customers falls outside the ambit of the First Amendment's protection of expressive association.[115] While the videos available at the Blue Door contain expression that is entitled to First Amendment protection, the sale or renting of expressive materials does not by itself create an expressive association between the participants in the transaction. Moreover, Pinter makes clear that his claim "does not revolve around his right to associate, socially, with any individual or individuals at the Blue Door," but rather "is about [his] right to shop at a retail establishment of his choice."[116]  Because

---

[114]    *See* Pl. Opp. at 11–12 (citing only First Amendment in opposition to summary judgment on right of association claim); *id.* at 13–16 (*Monell* claim, including based on First Amendment violations).

[115]    *See In re Grand Jury Subpoena Served upon Crown Video Unlimited, Inc.*, 630 F. Supp. 614, 619 (E.D.N.C. 1986) ("While the videotapes involved in such commercial transactions are a form of speech protected by the first amendment, the commercial relationship arising from such transactions itself is not protected as an associational right arising under the first amendment." (citation omitted)).  *See also In re PHE, Inc.*, 790 F. Supp. 1310, 1317 (W.D. Ky. 1992) (holding that commercial relationship between seller of "sexually candid magazines and films" and its customers was not protected as an associational right, where seller "provided no information suggesting that it has advocated, in tandem with its clients, any political, economic, religious, or cultural beliefs through their commercial relationship which would give rise to a recognized protected status under the first amendment").

[116]    Pl. Opp. at 12.

Pinter's claim arises entirely from alleged interference in a non-expressive commercial relationship, his claim does not assert a violation of the right to expressive association under the First Amendment and cannot withstand summary judgment.

### E.    Discriminatory Treatment Based on Sexual Orientation

The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[117]  The Clause "is essentially a direction that all persons similarly situated should be treated alike."[118]  It prohibits intentional discrimination on the basis of protected classifications such as race and sexual orientation, but not government action that merely has a disproportionate impact on those classes.[119]

> To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious

---

[117]    U.S. CONST. amend. XIV § 1.

[118]    *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

[119]    *See Washington v. Davis*, 426 U.S. 229, 239–40 (1976); *Windsor*, 699 F.3d at 181 (concluding that homosexuality qualifies as a quasi-suspect classification deserving of heightened scrutiny).

or bad faith intent to injure a person."[120]

Pinter argues that he was targeted by the police because of his sexual orientation: "UC 31107 target[ed] the Plaintiff and went up to the Plaintiff simply because he perceived the Plaintiff to be a gay man and because the Blue Door was believed to be a location where gay men engaged in prostitution."[121]  Pinter does not identify similarly situated individuals who were treated differently than him.[122]

As an initial matter, I note that once UC 31107 was assigned the role of someone seeking a gay male prostitute, the Equal Protection Clause did not require him to approach straight and gay men in equal proportion.  If intentional

---

[120]  *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).  *Accord Doninger v. Niehoff*, 642 F.3d 334, 357 (2d Cir. 2011).

[121]  Pl. Opp. at 12.

[122]  Instead, Pinter offers the following analogy:  "assuming that the Blue Door Video Store had received complaints that African American males were engaged in drug dealing inside of the establishment, an undercover agent could not target any African American male inside of the store and without a reasonable suspicion that the male was engaged in drug dealing." *Id.* at 13 n.18.  As discussed above, however, Pinter was not stopped prior to his arrest.  *See supra* Part III.C.  In addition, Pinter's analogy blurs the line between his Fourth and Fourteenth Amendment claims.  The hypothetical stops of African Americans clearly lack reasonable suspicion, and thus violate the Fourth Amendment.  *See Swindle*, 407 F.3d at 566.  It is less clear whether the hypothetical stops violate the Equal Protection Clause, because the hypothetical does not clarify whether the officer intentionally treated African Americans differently than similarly situated non-African Americans.  *See Washington*, 426 U.S. at 239–40.

discrimination based on sexual orientation took place in this case, it took place in the NYPD's choice to assign undercover officers to solicit gay male prostitutes in the Blue Door and other Manhattan video stores in the first place.  But Pinter has provided no evidence that the NYPD treated the problem of gay prostitution at video stores differently than the problem of straight prostitution at similar locations or businesses.  Pinter has provided no comparative evidence to support the conclusion that the NYPD's enforcement activity at the Blue Door and other video stores constituted intentional discrimination against gays.[123]

Pinter states that "[e]very individual arrested at video stores in the Manhattan South geographic area for the crime of prostitution . . . [was] male."[124] But the supporting evidence for this assertion only shows that the prostitution arrests at a number of Manhattan video stores were of males, not that the males were gay, nor that there were no arrests of female prostitutes at other Manhattan video stores.[125]  Indeed, at least one of the documents listing prostitution arrests at

---

[123]    *See* Pl. 56.1 ¶¶ 33–44; Pl. Opp. at 12–13.

[124]    Pl. 56.1 ¶ 34.

[125]    *See generally* Conroy Report.  Of course if all the undercovers were male, then it may be fair to assume that all of the arrestees were gay.

video stores describes complaints regarding prostitution by underage females.[126]

Even assuming that the NYPD was systematically targeting gay prostitution at

certain Manhattan video stores, no reasonable jury could infer from this that the

NYPD was not also systematically targeting straight prostitution elsewhere.

Evidence that the NYPD dedicated some of its resources to combating a criminal

activity that bears an inevitable relation to sexual orientation — such as

prostitution in a locale frequented by gay men — is insufficient in the absence of

comparative evidence to support the conclusion that the NYPD intentionally

discriminated *based on* sexual orientation.[127]

---

[126]    *See id.* at 3.  In addition, as defendants note, Pinter concedes that "the arrestees of the enforcement team on the evening of Plaintiffs' arrest were male and female, arrested in three different places."  Def. Reply at 4 (citing Pinter Dep. at 132).

[127]    I note that the facts of this case are quite different from those in *Floyd v. City of New York*, No. 08 Civ. 1034, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013), which also dealt with allegations of discrimination by the NYPD.  In particular, Pinter does not allege that the NYPD responded to evidence of gay prostitution at video stores by directing its officers to target gay men near video stores for enforcement activity *in general* — stopping them while not stopping equally suspicious straight men, arresting them while not arresting straight men displaying identical behavior, and doing so regardless of whether the stop or arrest had anything to do with prostitution.  If there had been evidence of this kind of selective enforcement, Pinter would have had a much stronger claim for intentional discrimination based on sexual orientation.  *Cf. id.* at *7, *72–74 (holding that the Equal Protection Clause prevents the police from targeting a protected group for heightened levels of general enforcement activity based on the disproportionate representation of that group in local crime complaints).

        There are any number of scenarios in which the targeting of gays for

F.     **Malicious Abuse of Criminal Process**

"In New York, a malicious abuse of process claim lies against a

defendant who (1) employs regularly issued legal process to compel performance

or forbearance of some act (2) with intent to do harm without excuse or

justification, and (3) in order to obtain a collateral objective that is outside the

legitimate ends of the process."[128]  The malicious abuse of *criminal* process may

give rise to a Section 1983 claim, because the resulting deprivation of liberty is

"'by definition a denial of procedural due process.'"[129]

_____

police enforcement activity could result in an equal protection violation.  For
example, if an analysis of all NYPD arrests of men for prostitution or solicitation
based on undercover operations revealed that all or nearly all of the men arrested
were gay, while other evidence demonstrated that many men engaged in
prostitution or solicitation were straight, and if the plaintiff could also provide
sufficient evidence of discriminatory intent, then a reasonable jury could conclude
that the NYPD was selectively enforcing the prostitution laws against gay men in
violation of the equal protection clause.  Pinter has simply failed to provide
sufficient evidence — and in particular comparative evidence — for a reasonable
jury to find that such a violation took place here.

[128]    *Cook*, 41 F.3d at 80 (citing *Curiano v. Suozzi*, 63 N.Y.2d 113, 116
(1984); *Board of Educ. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397,
403 (1975)).  A classic example of abuse of process can be found in *Dishaw v.
Wadleigh*, 44 N.Y.S. 207 (1897), which "involved an attorney who assigned claims
to an associate living in another part of the State for the purpose of having the
associate institute proceedings," so that defendants would find it easier "to pay the
claim than to submit to the discomfort and expense of attending a distant court."
*Farmingdale*, 38 N.Y.2d at 402 (discussing *Dishaw*, 44 N.Y.S. at 207).

[129]    *Cook*, 41 F.3d at 80 (quoting *Jennings v. Shuman*, 567 F.2d 1213,
1220 (3d Cir. 1977)).  Traditionally, it has been said that "[w]hile malicious

The Second Circuit has held that "to state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose *beyond or in addition to*

---

prosecution concerns the improper issuance of process, '[t]he gist of abuse of process is the improper use of process after it is regularly issued.'" *Id.* (quoting 2 COMMITTEE ON PATTERN JURY INSTRUCTIONS, ASSOCIATION OF SUPREME COURT JUSTICES, NEW YORK PATTERN JURY INSTRUCTIONS § 3:51 at 816 (1968)). *Accord Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) ("The pursuit of a collateral objective must occur *after* the process is issued; the mere act of issuing process does not give rise to a claim."); *Curiano*, 63 N.Y.2d at 117.

However, the meaning of the word "after" in this context is unclear. It appears to require that the abuser of process first obtain regularly issued process, and then carry out some independent second act that constitutes the abuse. But the case law does not reflect this requirement. Often, the regular issuance of process *is* the abuse. For example, in *Farmingdale*, the New York Court of Appeals held that the following could constitute abuse of process: "subpoenaing, with the intent to harass and to injure, 87 teachers and refusing to stagger their appearances," in order "to inflict economic harm on the school district." *Farmingdale*, 38 N.Y.2d at 399, 404. The *Farmingdale* defendants' abuse lay in their preparing and issuing the subpoenas, not in any subsequent act — unless the abuse is arbitrarily defined not as their issuing of the subpoenas, but as their refusal to reschedule them. The latter reasoning does not appear in *Farmingdale*, which treats the refusal to reschedule merely as evidence of the defendants' original motive. *See id.* at 404.

More recently, the New York Court of Appeals questioned whether the requirement that process be abused "after" it is issued "should be viewed as a strict and limiting definition of the tort or whether it is merely illustrative." *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 530 (1991). "Nothing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself." *Id.* Nevertheless, the Court of Appeals left the question open, and so it remains. *See Widget v. Town of Poughkeepsie*, No. 12 Civ. 3459, 2013 WL 1104273, at *8 n.7 (S.D.N.Y. Mar. 18, 2013).

his criminal prosecution."[130]  In other words, the proper use of legal process based

on an improper or malicious *motive* such as a desire for retaliation is insufficient to

satisfy the "collateral objective" requirement.[131]  There must be an *abuse* of

process, that is, a use of process that has as its direct object the achievement of an

improper and ulterior "*purpose* or *objective*."[132]  Finally, while the law is not

---

[130]     *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003) (emphasis added).  I note that these statements are difficult to reconcile with the holding of *Cook*, where the Second Circuit found an actionable abuse of process based on plaintiff's allegation that defendants fraudulently arraigned him and then held him in custody *as retribution* for legal advice he had given to a third party.  *See Cook*, 41 F.3d at 80 (citing *Farmingdale*, 38 N.Y.2d at 404, which states:  "Where process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party.").  *Accord Abreu v. Romero*, 466 Fed. App'x 24, 26 (2d Cir. 2012) ("To make out [an abuse of process claim, the plaintiff] was required to demonstrate that the defendants employed legal process 'in order to obtain a collateral objective that is outside the legitimate ends of the process,' *such as retribution*." (quoting *Cook*, 41 F.3d at 80) (emphasis added)).

[131]     *See Savino*, 331 F.3d at 77–78 (citing *Dean v. Kochendorfer*, 237 N.Y. 384 (1924) (distinguishing between improper motive and improper purpose)).  *See also Hauser v. Bartow*, 273 N.Y. 370, 374 (1937) (finding no abuse of process because "whatever may have been respondent's motives, she used the process of the court for the purpose for which the law created it").

[132]     *Savino*, 331 F.3d at 78.  The distinction between a proper *use* of process based on a malicious motive, and an improper *abuse* of process to achieve a collateral objective, is not always easy to discern.  Indeed, when a party employs process based in part on malice toward an adversary, the party ordinarily seeks to harm the adversary.  This harm is outside the legitimate ends of the process.  It is difficult to see why such harm should not be called, in every case, a "collateral objective" of the party's use of process, in satisfaction of the third element of an abuse of process claim.  The distinction between improper motive and improper

entirely settled on this point, the weight of authority holds that the presence of

probable cause negates a claim for abuse of criminal process.[133]

---

purpose, cited with approval in *Savino*, is similarly difficult to apply.  *See id.* at 77 (citing *Dean*, 237 N.Y. at 384).  When a party employs regularly issued process with the improper *motive* of harming an adversary, the resulting harm could also be described as "an ulterior *purpose* or *objective*" of the party's use of the process.  *Id.* at 78.

      Rather than attempting to determine whether the use of process was based on an improper "purpose" or merely an improper "motive," the canonical New York case law suggests that it might be more pertinent to inquire whether the use of process was sufficiently *pretextual* as to constitute abuse:

> *Compare Curiano*, 63 N.Y.2d at 117 (no abuse of process where defendant initiated libel action with [secondary] purpose of punishing free speech and electoral participation and inflicting expense and burden), *and Hauser*, 273 N.Y. at 374 (no abuse of process where the defendant initiated incompetency proceeding with [secondary] purpose of damaging the alleged incompetent and enriching herself), *with* [*Farmingdale*, 38 N.Y.2d at 404] (abuse of process where the defendant subpoenaed 87 of school district's teachers to testify on the same day with [actual] purpose of inflicting economic harm on the school district)[, *and Dean*, 237 N.Y. at 390] (abuse of process where magistrate issued an arrest warrant for disorderly conduct with [actual] purpose of bringing arrested person into court for an unrelated disciplinary rebuke).

*Jones v. Maples/Trump*, No. 98 Civ. 7132, 2002 WL 287752, at *7 (S.D.N.Y. Feb. 26, 2002), *aff'd sub nom. Jones v. Trump*, 71 Fed. App'x 873 (2d Cir. 2003). *Accord Chrysler Corp. v. Fedders Corp.*, 540 F. Supp. 706, 727 (S.D.N.Y. 1982) (in abuse of process claim, "the plaintiff must . . . be able to show a pretextual use of seemingly proper process").

[133]    *See Jones v. J.C. Penny's Dep't Stores Inc.*, 317 Fed. App'x 71, 74 (2d Cir. 2009) ("The conclusion that Jones could not prevail on her claims that the officers lacked probable cause for her arrest or that they discriminated against her

As stated above, a reasonable jury could find that Pinter was arrested without probable cause.  Drawing all reasonable inferences in favor of Pinter, there is also sufficient evidence in the record for a jury to find that the City had a custom of arresting gay men for prostitution without probable cause in order to obtain the collateral objective of commencing nuisance abatement proceedings against video stores frequented largely, although not entirely, by members of the gay, lesbian, bisexual, and transgender communities.  The use of prostitution arrests for leverage in negotiations over nuisance abatements, without any apparent interest in conviction, is not a proper purpose for carrying out a program of prostitution arrests.  In addition, to the extent that the City maintained a custom of carrying out false arrests, a reasonable jury could infer that the City intended to harm those who were arrested.  The City also knew or should have known that false arrestees like Pinter would be harmed.  Finally, the goal of nuisance abatement does not provide

---

based on her race required dismissal of her state and federal claims of abuse of process."); *Sforza v. City of New York*, No. 07 Civ. 6122, 2009 WL 857496, at *17 (S.D.N.Y. Mar. 31, 2009) ("While a lack of probable cause is not explicitly an element of an abuse of process claim, the presence of probable cause negates a claim for abuse of process, particularly the second element." (citing *Rosen v. Hanrahan*, 768 N.Y.S.2d 818, 819 (2003))).  *But see Disorbo v. Hoy*, 74 Fed. App'x 101, 103 (2d Cir. 2003) ("[L]iability for abuse of process does not require a showing of the lack of probable cause." (citing *Shain v. Ellison*, 273 F.3d 56, 68 (2d Cir. 2001))).  *Disorbo*'s analysis is questionable.  *Shain* recites the elements of an abuse of process claim, but does not state that such a claim can succeed despite the presence of probable cause.  *See Shain*, 273 F.3d at 68.

an "excuse" or "justification" in the relevant sense.

In light of the above, a reasonable jury could conclude that the custom of prostitution arrests that resulted in Pinter's arrest constituted an abuse of criminal process.[134]  Pinter has a triable abuse of process claim under Section 1983 against the City.  However, the Second Circuit's conclusion that the individual defendants had arguable probable cause forecloses Pinter's abuse of process claims against them.[135]

Pinter also brought an abuse of process claim under state law. Defendants argue that Pinter's state law claim for abuse of process is barred because he failed to file a timely notice of claim.[136]  Under New York law, a

---

[134]    For the purpose of an abuse of criminal process claim, an arrest may be considered as "regularly issued process."  *See Widget*, 2013 WL 1104273, at *8 (citing *Cook*, 41 F.3d at 80; *Tadco Constr. Corp. v. Dormitory Auth. of N .Y.*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010)).  I also note that the fact that Pinter's arrest may not have been based on probable cause, and thus could be considered "irregular" criminal process, is not fatal to Pinter's claim.  *Cook* illustrates that irregular process — in that case, an arraignment known to be based on an arrest lacking probable cause — can constitute abuse of criminal process.  *See Cook*, 41 F.3d at 80.

[135]    *See Ketchuck v. Boyer*, No. 10 Civ. 870, 2011 WL 5080404, at *8 (N.D.N.Y. Oct. 25, 2011) (holding that "arguable probable cause provides an objectively reasonable justification for issuing process," and thus gives rise to qualified immunity against an abuse of process claim no less than against a false arrest claim).

[136]    *See* Def. Mem. at 16, n. 3.

plaintiff in a tort action against a municipality must file a notice of claim "within ninety days after the claim arises."[137]  Pinter filed his notice of claim on August 22, 2009.  Defendants assert that a claim for abuse of process arises "at the time that the process is issued, or at the latest, by the time plaintiff is aware of the abuse."[138]  Thus, defendants argue that the claim arose either on October 10, 2008, the date of Pinter's arrest, or at the very latest, on February 11, 2009, when Pinter "met with members of the NYPD in New York City Council Speaker Christine Quinn's office."[139]  Plaintiff responds that the claim did not accrue "until the relevant Criminal Court proceedings conclude[d]" with the dismissal of the complaint on June 22, 2009, rendering his notice of claim timely.[140]

Under New York law, favorable termination is not an element of the abuse of process claim and "accrual of a cause of action for abuse of process need not await the termination of an action in claimant's favor."[141]  "[A] claim for abuse of process accrues at such time as the criminal process is set in motion," unless the plaintiff is unaware, though no fault of his own, of facts supporting the claim, in

---

[137]    N.Y. Gen. Mun. L. §§ 50-e and 50-i.

[138]    Def. Mem. at 16.

[139]    *Id.*

[140]    Pl. Opp. at 24.

[141]    *Cunningham v. New York*, 53 N.Y. 851, 853 (1981).

which case the cause of action accrues upon discovery.[142]  Because Pinter was

aware of the underlying facts supporting an abuse of process claim at least as of

February 2009, his state law claim for abuse of process is barred for failure to file a

timely notice of claim.

### G.   Shari Hyman

"Those [prosecutorial] acts that are 'intimately associated with the

judicial phase of the criminal process' [are] shielded by absolute immunity, but not

'those aspects of the prosecutor's responsibility that cast him in the role of an

administrator or investigative officer rather than that of advocate.'"[143]  In *Pinter I*, I

provisionally granted defendants' motion for summary judgment as to plaintiffs'

claims against Shari Hyman, the Director of the Office of Special Enforcement,

which prosecuted the nuisance abatement proceedings against the Blue Door.[144]  I

noted, however:

> Hyman *may have* . . . been functioning in an investigatory role
> when she promulgated and implemented the alleged policy, akin

---

[142]     *Diamutef v. Morris*, 956 F. Supp. 1112, 1118 (S.D.N.Y. 1997).
*Accord Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1995) ("The
crucial time for accrual purposes is when the plaintiff becomes aware that he is
suffering from a wrong for which damages may be recovered in a civil action.").

[143]     *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Briscoe v.
LaHue*, 460 U.S. 325, 342 (1983)).

[144]     *See Pinter I*, 710 F. Supp. 2d at 423–25.

to when a prosecutor provides advice to the police during the investigative phase of a criminal case.  If Pinter discovers that Hyman acted in an investigatory capacity — and such an act was not "integral" to her advocacy functions — then he may amend his Complaint accordingly.  Should that occur, it will be necessary for me to revisit the question of whether Hyman is entitled to absolute immunity.[145]

Pinter now seeks leave to amend his Complaint to add Hyman as an individual defendant.[146]  Defendants object that Pinter should be required to file a separate motion with this request.[147]

No separate motion practice is necessary, however, because Pinter has failed to discover evidence sufficient to justify revisiting this Court's prior finding of absolute immunity.  The investigatory acts that Hyman allegedly carried out — a web search for Blue Door and a request for evidence from the NYPD as part of her initiation of the nuisance abatement action[148] — were part of "'the organization, evaluation, and marshalling of . . . evidence'" that is integral to her

---

[145]    *Id.* at 425.

[146]    *See* Pl. Opp. at 25.

[147]    *See* Def. Reply at 9.

[148]    *See* Pl. Opp. at 26–27.  Pinter also alleges that Hyman called the Manhattan South Vice on October 10, 2008, the date of Pinter's arrest, and requested that they "engage in a prostitution crime related arrest activity" at the Blue Door.  *Id.* at 27.  No evidence cited by Pinter supports this allegation.  *See* Pl. 56.1 ¶ 76; Deposition of Shari Hyman, Ex. 27 to Meyerson Decl., at 180–181.

advocacy functions.[149]  Pinter's claims against Hyman are dismissed with

prejudice.

### H.    Supervisory Liability and Other Individual Defendants

"Because vicarious liability is inapplicable to . . . [Section] 1983 suits,

a plaintiff must [prove] that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."[150]  Pinter's

opposition to summary judgment offers a conclusory paragraph stating that named

defendants Sergeant Michael Madison, Deputy Chief Brian Conroy, Chief

Anthony Izzo, Chief Joseph Esposito, and Police Commissioner Raymond Kelly

bear supervisory liability — without explaining how any of these individuals

violated Pinter's rights through their own actions.[151]  As defendants accurately note

in their reply brief, Pinter's conclusory paragraph does not show "any

constitutional violation on the part of the [individual supervisory] Defendants,"

including Mayor Bloomberg.[152]  Nor does Pinter's Rule 56.1 Counter-Statement

---

[149]    *Ying Jing Gan v. City of New York*, 996 F.2d 522, 528 (2d Cir. 1993) (quoting *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987)).

[150]    *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  *Accord Bouche v. City of Mount Vernon*, No. 11 Civ. 5246, 2012 WL 987592, at *8 (S.D.N.Y. Mar. 23, 2012).

[151]    *See* Pl. Opp. at 27–28.

[152]    Def. Reply at 10.

contain evidence that could support the liability of any of the supervisory defendants.[153]

## IV.   CONCLUSION

For the foregoing reasons, Pinter's motion to disregard *Monell* is denied.  Defendants' motion for summary judgment is granted in part and denied in part.  Pinter may proceed on his false arrest, malicious prosecution, excessive force, and abuse of process claims against the City under *Monell*.  Pinter may proceed on his excessive force claim against the individual NYPD personnel in the van.  Pinter's state law abuse of process claim is dismissed.  Hyman is dismissed from the litigation based on absolute immunity.  All remaining individual defendants are also dismissed.

The Clerk of the Court is directed to close the parties' motions [Dkt. Nos. 67, 83].  A conference is scheduled for October 31, 2013 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 10, 2013

_____

[153]     *See* Pl. 56.1.  *Accord* City Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ¶¶ 18–55.

**- Appearances -**

| | |
|---|---|
| **For Plaintiff:** | **For Defendants:** |

James I. Meyerson, Esq.
64 Fulton Street, Suite 502
New York, NY 10038
(212) 226-3310

Jeffrey A. Rothman, Esq.
315 Broadway, Suite 200
New York, NY 10007
(212) 227-2980

Dara Olds
Senior Counsel
Special Federal Litigation Division
Law Department
City of New York
100 Church Street, Room 3-198
New York, NY 10007
(212) 356-2385